(No. 35242.—

THE CITY OF ALTON *et al.,* Appellees, *vs.* THE COMMERCE COMMISSION *et al.*—(ALTON WATER COMPANY *et al.,* Appellants.)

*Opinion filed January 22, 1960—Rehearing denied March 30, 1960.*

GRENVILLE BEARDSLEY, Attorney General, of Springfield, and HARRY R. BEGLEY, Special Assistant Attorney General, of Chicago, for the Illinois Commerce Commission.

ISHAM, LINCOLN & BEALE, of Chicago, and MALCOLM D. DURR, of Alton, (CHARLES A. BANE, and GEORGE B. BEALL, of counsel,) for appellant Alton Water Company.

JOHN W. HOEFERT, JOHN B. COPPINGER, JR., RONALD C. MOTTAZ, and J. F. SCHLAFLY, JR., and R. EMMETT FITZGERALD, all of Alton, for appellees.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

The Illinois Commerce Commission granted the Alton Water Company an increase in its rates, which was set aside upon review in the circuit court of Madison County. The Commission and the Company have appealed. The case involves some problems that are unique to this utility, and some that are of more general interest.

The Alton Water Company furnishes water services to approximately 14,000 customers, including many industrial

users, in Alton and neighboring areas. Its distribution system has approximately 165 miles of underground mains, and it includes several large standpipes, an elevated tank, booster stations in outlying areas, and a purification plant and pumping station near the source of supply, the Mississippi River. The plant was originally installed in 1876, and from time to time it has been enlarged, improved and renovated. Since 1953, almost one million dollars has been expended for additions.

All of the Company's common stock is held by the American Waterworks Company. Sixty per cent of American's stock is owned by Northeastern Water Company which in turn is almost wholly owned by two individuals.

In 1952 the Company obtained a forty per cent increase in all of its rates. The present proceeding was instituted five years later, on February 5, 1957, with the filing of rate schedules by which the Company proposed a fifty per cent increase in rates for all service except municipal fire protection, to be effective March 8, 1957. The Commission suspended the schedules and held hearings during the summer and autumn of 1957. Municipalities and many industries served by the Company intervened to oppose the increase. The Commission found the fair value of the Company's plant to be $4,000,000 and added $100,000 as an allowance for working capital, to establish a rate base of $4,100,000. It also found a return of 5.6 per cent on this value to be fair and reasonable, and established a rate schedule which would produce this rate of return. This new schedule effected an increase of 47½ per cent over the rates adopted in the 1952 proceeding and established rates 106½ per cent higher than those existing in 1951.

The intervenors appealed to the circuit court which set aside the Commission's order. The court held that the Commission's rate base determination was against the weight of the evidence, (1) because it was based in part upon a reproduction cost figure which included an unjustified ex-

pense item of 15 per cent for general construction over-heads, (2) because an insufficient rate of depreciation was deducted from reproduction cost, and (3) because it included $67,500 to cover cash working capital requirements although moneys collected from consumers and held for future tax payments were available for this purpose. The court also disallowed the rate of return established by the Commission upon the ground that it would in fact give a 17 per cent return to the common stockholder. In addition, the court found that the rate schedule adopted by the Commission would produce more net revenue than the amount found by the Commission, (1) because the Commission erroneously allowed as present expenses Federal taxes which were deferred until future years by the Company's use of accelerated depreciation under section 167 of the Internal Revenue Code of 1954, and (2) because the Commission failed to account for increased revenue which would result from improved meter maintenance and from changes from flat rates to metered rates.

From this judgment the Company and the Commission appeal. They contend not only that all of the circuit court's holdings were erroneous but also that the court exceeded the proper scope of judicial review. The Commission objects particularly to setting aside its order because of purported errors in computing reproduction value less depreciation when the final fair value determination is not challenged as unreasonable. It argues that if the final determination is reasonable the courts should not inquire into the separate elements of value which are considered in reaching that finding. This position ignores the right of the parties and the public not just to a reasonable determination but rather to a determination which arises from sound and lawful analysis of the problems presented. Without power to review the intermediate steps in the administrative decision-making process, effective judicial review would be extremely difficult if not impossible. Neither the

statute nor this court's decisions in the rate regulation field indicate that such a result is intended. This court has not confined its review to the Commission's final order but rather, when called upon to do so and with respect for the Commission's expert judgment, it has reviewed the elements of value considered by the Commission in computing present fair value. (See *Peoples Gas Light & Coke Co.* v. *Slattery*, 373 Ill. 31, 51-56.) Accordingly we turn to a consideration of the specific problems presented.

## THE RATE BASE

*General Overhead Expenses.* In determining the fair value of the Company's plant, the Commission properly considered evidence and made findings on the original cost less depreciation and reproduction cost new less depreciation. In their computation of reproduction cost new before depreciation, both the Company's witness, Louis R. Howson, and the Commission's witness, Gordon Cavanagh, added to the basic cost of reproducing all of the company's physical assets, an item of expense for "general overheads" amounting to 15 per cent of that cost. Howson listed the overhead expenses as follows:

| | | |
|---|---|---|
| 1. | Organization expense | 1% |
| 2. | Engineering and supervision during design and construction | 5% |
| 3. | Administrative and legal costs | 2% |
| 4. | Omissions and contingencies | 2% |
| 5. | Interest lost on non-productive investment during construction | 4.95% |

The Commission apparently accepted the testimony of these witnesses, for it found a reproduction cost new of $8,700,000 which is substantially that suggested by the company on the basis of the 15 per cent figure.

General overhead expenses are a proper component of reproduction cost new. (See *Driscoll* v. *Edison Light & Power Co.* 307 U.S. 104, 117-18, 83 L. ed. 1134 (1939);

*Ohio Utilities Co.* v. *Public Utilities Com.* 267 U.S. 359, 362, 69 L. ed. 656 (1925); Welch, Preparing for the Utility Rate Case 180 (1954).) To compute them as a percentage of basic physical reproduction cost seems acceptable because it is probable that their amount would be related to the cost of what is being reproduced. The question remains whether overhead expenses amounting to 15 per cent of the basic reproduction cost are justified in this case. The only testimony bearing on this issue is the conclusion expressed by Howson and Cavanagh that 15 per cent should be included in reproduction cost new and Howson's statement that this figure was supported by the experience of his consulting engineering firm. However, the Commission's counsel conceded on oral argument that he knew of no instance in which the Commission had theretofore allowed so high a percentage. An unusually high percentage can not be justified in terms of generally rising costs, because the present level of costs is already reflected in the basic reproduction cost, of which the overhead item is a percentage. If there are other grounds that support an increase in the percentage of permissible overhead, they should appear from evidence more specific than the bare conclusions of the witnesses.

*Depreciation on Reproduction Cost.* The Company's witness Howson testified that depreciation of 15 per cent should be deducted from the reproduction cost of the Company's plant. The Commission's witness Cavanagh testified to depreciation of 26 per cent, and the Commission found 25 per cent depreciation. Howson relied primarily on inspection for his determination of depreciation, supported by calculations on a 4 per cent sinking fund basis. Cavanagh also inspected all of the Company's above-ground facilities and examined pertinent records, but depended to a greater extent on 3 per cent sinking fund computations. The circuit court felt that the observation method employed by these two witnesses was not reliable since 40 per

cent of the Company's plant consists of pipes and mains located beneath the ground and not subject to inspection. Evidence of subnormal service to many customers, coupled with straight-line computations indicating a depreciation figure of 37 per cent, convinced the court that the Commission's determination was erroneous.

Although the straight-line method of computing depreciation is widely accepted, it is only an accounting technique for allocating the cost of fixed assets over the life of the assets. It is not a measure of the actual deterioration of property. (*United Railway & Electric Co. of Baltimore* v. *West,* 280 U.S. 234, 262, 74 L. ed. 390 (1930).) For rate proceedings in which fair value is a controlling factor, a determination of depreciation by inspection may be preferable to accounting computations, and certainly is an acceptable method. (See *McCardle* v. *Indianapolis Water Co.* 272 U.S. 400, 71 L. ed. 316 (1926); *Pacific Gas & Electric Co.* v. *City and County of San Francisco,* 265 U.S. 403, 68 L. ed. 1075 (1924).) Therefore, the circuit court's straight-line computations indicating a depreciation figure of 37 per cent do not alone undermine the result reached by the Commission by other methods. Nor was the inspection defective because a large part of the Company's plant is located beneath the ground. Howson tested this portion of the plant by an examination of 95 out of a total of 200 cuts taken from the underground pipes and mains. Cavanagh checked the Company's figures by examination of the Company's records of installation and maintenance and through the use of age-life tables. The methods employed by these two witnesses seem reasonable and the Commission committed no error in basing its determination on their results.

There was testimony that the Water Company's service to domestic customers and for municipal fire protection was deficient in many respects. This might well indicate that physical depreciation had in fact proceeded beyond the

extent indicated by inspection. In holding the Commission's determination of depreciation erroneous, the circuit court considered this "appraisal by function" as "perhaps more convincing" than appraisal of depreciation by observation. The Commission, on the other hand, dealt with the problem of substandard service not by adjusting depreciation but by a direct order requiring the Company to submit, within 60 days, plans for improving service.

We cannot agree that the Commission's approach was erroneous. Both supervision of service and supervision of rates are functions of regulatory commissions. In several jurisdictions, it has been held that these functions must be kept distinct so that a rate increase may not be conditioned upon the utility's compliance with an order to improve service. (E.g., *Florida Telephone Corp.* v. *Carter*, 70 So.2d 508 (Fla. Sup. Ct. (1954)); *Elyria Telephone Co.* v. *Public Utilities Com.* 158 Ohio St. 441, 110 N.E.2d 59 (1953).) And in another State it was held error for a Commission to decrease the rate of return because of substandard service, on the ground that this action would prevent the utility from acquiring the capital necessary to improve its service. (*Petitions of New England Telephone and Telegraph Co.* 116 Vt. 480, 80 A.2d 671 (1951).) In this case it is not necessary to decide these broad issues of the Commission's authority and power. We hold only that it was permissible and reasonable for the Commission to deal with deficient service in a separate order rather than by adjustments to depreciation. See *Village of Apple River* v. *Illinois Commerce Com.* 18 Ill.2d 518.

*Working Capital.* The Commission included in the rate base an item of $100,000 for working capital requirements in the form of cash and materials and supplies. In their briefs before this court the parties agree that of this amount $32,500 was allowed for materials and supplies and the remaining $67,500 for cash. The circuit court held that the allowance for cash working capital was improper since

more than $67,500 in cash was available to the Company each month from customers' payments for accrued taxes which would only be payable to the government in future years. Although the same objection applies as well to the allowance for materials and supplies, the court limited its decision to cash working capital apparently because only this issue was raised specifically in the intervenors' petition for rehearing before the Commission. (See section 68 of the Illinois Public Utilities Act. Ill. Rev. Stat. 1959, chap. 111⅔, par. 72.) However, since the question of whether accrued but unpaid taxes should be offset against part of the working capital allowance was presented in the petition for rehearing, the Commission was fairly confronted with the basic issue and it should be open on review as to the entire $100,000, including materials and supplies as well as the cash allowance.

A working capital allowance is designed to provide a return on those funds which are used to pay expenses incurred before the income produced by those expenses has been received. Such a return is not justified where payments by the utility's customers make funds available to meet current expenses without additional investment by the stockholders. Where tax accruals actually make funds available, it is error for the Commission to ignore them and fail to offset them against the working capital allowance. See *City of Cincinnati* v. *Public Utilities Com.* 161 Ohio St. 395, 119 N.E.2d 619 (1954); *City of Pittsburgh* v. *Pennsylvania Public Utility Com.* 370 Pa. 305, 88 A.2d 59 (1952); cf. *Chicopee Mfg. Co.* v. *Public Service Co.* 98 N.H. 5, 93 A.2d 820 (1953).

In this case the Company's comptroller, S. E. Kerr, testified that the Company's annual property taxes, which are accrued monthly and which are available for use by the Company before being paid to the State the following year, amount to approximately $75,000. In addition, the intervenors have computed without challenge from the

Company or the Commission that more than $100,000 will be available every month from accrued Federal and other State taxes. The above testimony and computations indicate that the working capital allowance was not justified by the record in this case. A determination of the extent to which funds are actually available from tax accruals for working capital should be made by the Commission on remand.

## RATE OF RETURN

The Commission found that a return of 5.6 per cent was fair and reasonable. The lower court reversed this finding because its computations indicated that the common stockholder was in fact receiving a 17 per cent return on its investment. This result was reached by subtracting interest on debt and preferred stock dividends from the estimated revenue after operating costs, $230,758, to produce a net income available for distribution to stockholders of $135,138. This amounts to approximately 17 per cent of the common stock investment valued at par.

The approach taken by the circuit court assumes correctly that the return to each class of security holder is relevant in judging whether a given overall rate of return is reasonable. Due to the relatively low cost of debt financing, an overall rate of return of 5.6 per cent might yield a return to common stockholders of 6 or 7 per cent in a utility with little debt but yield a much higher return to common shareholders of a highly leveraged utility with a high percentage of debt in its capital structure. Neither the Commission nor the courts may ignore this fact. The circuit court also assumed, however, that return on the original common stock investment was the relevant figure in determining the reasonableness of an overall rate of return. In this assumption the court erred. It is well established in Illinois that the utility is entitled to a reasonable overall return on the fair value of its property, not the original cost. This provides a flexible rate-making standard

which is equally applicable in periods of rising and falling price levels. (See *City of Chicago* v. *Illinois Commerce Com.* 4 Ill.2d 554.) It would be inconsistent to judge the overall return on the basis of fair value but judge the return accruing to common shareholders on the basis of a par value which is essentially original cost. The significant figure is the rate of return on common stock valued at fair value.

Several methods of computing this figure might be used. Either actual debt costs or hypothetical debt costs based on the current market might be subtracted from revenue after operating costs to produce net income allocable to equity. The fair value attributable to common stock might be determined by subtracting the par value of debt and preferred stock, to reflect the fact that all increments in value belong to equity, or by dividing fair value in the same percentages as book value. The sizeable short term debt may be considered entirely as debt or its temporary nature might be recognized by allocating part to debt and part to equity. Whatever method is chosen as most appropriate in this case the return on the fair value attributable to common stock falls within the range of the testimony.

NET REVENUE

The circuit court determined that the rates fixed by the Commission will generate more funds and consequently yield a greater return than estimated by the Commission because the Commission erroneously allowed certain expenses and ignored certain elements of income. We discuss the income and expense items separately below.

*Income Tax Expenses Deferred Due to Accelerated Depreciation.* The Company has elected to depreciate its property, for income tax purposes, at an accelerated rate, as authorized by section 167 of the Internal Revenue Code of 1954. That section permits the cost of plant installed after December 31, 1953, to be depreciated for Federal tax purposes by methods which produce more depreciation in the

early years of the property's useful life, and less in the later years, than would be produced by straight-line depreciation. Since the depreciation deduction is larger, taxable income is reduced in the early years. The tax will increase in later years as the depreciation deduction falls below what it would have been under the straight-line method. Actual tax liability may remain depressed, however, if the Company should continue to add new facilities which may similarly be depreciated at the accelerated rate.

The Commission allowed the Company to subtract from gross income as a current expense not only the amount of Federal taxes actually paid, but also an amount equal to the difference between the taxes paid and the taxes that would have been due if the Company had used straight line depreciation for tax purposes. The order directed that the amount so accrued each year was to be credited to a special account which could not be used for dividend distribution to shareholders or transferred to surplus, but might be used for plant expansion. The circuit court held that the Commission's approach was erroneous and that only taxes actually paid should have been allowed as current expenses. This conflict between the views of the Commission and those of the court reflects a deep division in accounting and regulatory thinking which exists throughout the country. Persuasive reasoning and numerous decisions of courts and regulatory agencies may be cited in support of each position.

The Commission also maintains that by enacting section 167, Congress intended to afford corporations the opportunity to retain internally generated funds for expansion, and that this purpose would be thwarted and an unwarranted discrimination created if utilities were denied the same tax treatment as other corporations. The purpose of section 167, as revealed in the House and Senate reports bearing on the section, is to encourage plant expansion, particularly in high risk, growing and small businesses. (See H.R. Rep. No. 1337, 83d Cong. 2d Sess. 22-25 (1954),

1954 U.S. Code Cong. & Ad. News, Vol. 3, p. 4046-4050; S. Rep. No. 1622, 83d Cong., 2d Sess. 25-26 (1954), 1954 U.S. Code Cong. & Ad. News, Vol. 3, p. 4655-4656.) Under the policy of this State, utilities are allowed a rate of return calculated to attract the capital required for necessary expansion. (See, e.g., *City of Chicago* v. *Illinois Commerce Com.* 4 Ill.2d 554.) Since in this respect utilities differ from other corporations, the purpose of section 167 would not be thwarted nor would discrimination be introduced into the Federal tax law by requiring utilities to pass the savings of accelerated depreciation on to their customers. We must remember, furthermore, that we are not here dealing with the tax treatment of utilities but with the pricing of their product, that is, with the rate charged for their services. Congress has provided that all corporations may reduce their taxes by accelerated depreciation. It has not required the money thus retained to be used for expansion. (*City of Pittsburgh* v. *Pennsylvania Public Utility Com.* 182 Pa. Super. 551, 573-74, 128 A.2d 372 (1957).) Nor has it forbidden corporations to pass these savings on to their customers, and it may be supposed that many corporations have done so under the pressure of competition. If they have not, the purchaser has the option of changing to a different product. But utilities are at least partial monopolies, and no competition exists to induce them to pass savings on to the public. The customer cannot change products. We think, therefore, that this argument is not convincing as to State regulated utilities.

The other arguments advanced in support of the Commission's approach are more persuasive. They are founded on the assertion that accelerated depreciation does not reduce taxes but merely defers them from the early years of the useful life of an asset to the later years. So it is said that there is no tax saving, but merely a tax deferral. It is argued that if no provision is made currently for the increased tax liability which must arise, future ratepayers

will be forced to carry a tax burden that is properly attributable to present operations. Furthermore, it is contended that the existence of an unfunded tax liability must have an adverse impact upon the financial standing and credit of regulated utilities. Those who favor the court's approach respond that if a utility maintains a constant or increasing level of capital expenditure, a reasonable assumption in many cases in the utility field, deferrals in future years due to accelerated depreciation of additional new assets will equal or exceed the increased tax liability arising during the later years of the useful life of the older assets. Thus it is said that a continuous tax deferral might result from accelerated depreciation, producing in effect a permanent tax saving. (See *In the Matters of Amere Gas Utilities Co.* (F.P.C. 1956) Docket No. G-6358 (Majority and Dissenting Opinions); Note, 69 Harv. L. Rev. 1096 (1956).) This saving, it is argued, should benefit the consumers; the utility should not be allowed to establish a permanent reserve for a liability which will never have to be paid.

The assumption of a continuous deferral of taxes due to accelerated depreciation may be justified in many cases and the Commission would be justified in acting on this assumption if it saw fit. (See, e.g., *Maine Power Co. v. Public Utilities Com.* 153 Me. 228, 136 A.2d 726; *City of Pittsburgh v. Pennsylvania Public Utilities Com.* 182 Pa. Super. 551, 128 A.2d 372.) Experience may show that proper results can only be achieved by this approach. However, several not unlikely events might occur which would prove the assumption erroneous. A war, a general depression or a decline in the local market might curtail a utility's capital expenditures, and prevent further tax deferrals. As a result, taxes might increase just at the time when economic circumstances would make the added expense most burdensome. It is also possible that section 167 will be repealed, thus ending further tax deferrals.

If we could see clearly into the future and say with cer-

tainty that continuing expansion was certain, and counter-vailing considerations were nonexistent, we would hold that the Commission may not permit current charges for a liability that will never arise. Predictions of future developments, however, are unsure estimates at best. The problem is a new one; the factual and policy considerations that bear upon its solution have not as yet been fully developed. Even the future of accelerated depreciation in the Federal tax structure is not entirely settled. If for any reason continued investment in utility plant at current levels should cease, or accelerated depreciation be denied, the financial stability of utilities might be jeopardized if some provision had not been made for the increased taxes that would result. Rate regulation is a continuing process; greater experience may bring greater wisdom in dealing with these problems. At this time, we think it permissible for the Commission to safeguard the financial integrity of utilities by recognizing as present expenses those tax liabilities which are deferred by use of accelerated depreciation for Federal tax purposes.

The Commission may not, however, shift the benefit of accelerated depreciation from the ratepayers to utility shareholders. The Commission's order states that prepayment of deferred taxes by present ratepayers will not benefit the Company's shareholders because the funds so collected by the company may not be distributed as dividends or transferred to surplus. The order does not provide, however, that the prepaid funds must be deducted from the Company's rate base. If this deduction is not made, the entire benefit of accelerated depreciation goes to the shareholders, since earnings produced by the prepaid funds—either interest if the funds are invested in securities or income if the funds are put into new plant facilities—will belong to the shareholders, who would thus receive a return on money they did not invest in the Company.

The Commission's order therefore can not stand. Funds

generated by accruing deferred tax expenses, and any facilities financed out of those funds, must be excluded from the rate base. The earning power of this money then will either decrease consumer rates or increase service. The economic benefit to consumers over the life of any given asset should be about the same as if no accrual of deferred tax expenses were allowed, but it will be spread evenly over the useful life of the asset rather than being concentrated in the early years when depreciation rates for tax purposes are above normal.

*Increased income from improved meter maintenance and changes from flat rates to metered rates.* A Commission order requires the Company to inspect ten per cent of its meters (about 1400) every year. In recent years preceding the test year the Company examined approximately 750 meters, or approximately one-half the number required by the Commission's order. During the test year the Company inspected 1287 meters. In the same year pumped but unbilled water decreased from 22.49 per cent to 19.84 per cent of total water pumped. In the circuit court and in this court the intervenors have referred to trade publications indicating that inspection and repair of meters always increases the amount of water measured. Thus if in the future the Company complies with the Commission's order, and compliance can rightfully be expected since the Commission allowed $9100 annually for the expense of meter inspection, further reduction in the pumped but unbilled water, and correspondingly increased billings not included in the Commission's estimate, might result.

The Commission ordered the Company to introduce metered rates for some customers now receiving service at a flat rate. Assuming that the same amount of water will be delivered to these customers, the evidence indicates that an increase in income may result which likewise was not included in the Commission's estimate.

Although, as we have indicated, it seems reasonable to

expect some increase in income from these two items, the evidence bearing upon them is so incomplete that it is difficult to determine whether increases will actually result and, if so, how great they will be. Since the case must be remanded to the Commission on other issues, it will have an opportunity to apply its experience in solving the difficult problems of prediction that are involved.

For the reasons stated above, the circuit court properly reversed and set aside the order of the Illinois Commerce Commission. Its judgment must be modified, however, to order the cause remanded to the Commission for further proceedings in accordance with the views expressed in this opinion. (See *State Public Utilities Com. ex rel. City of Springfield* v. *Springfield Gas and Electric Co.* 291 Ill. 209, 236-37.) The judgment as so modified is affirmed.

*Judgment modified and affirmed.*