(No. 36973.—

THE CITY OF ALTON *et al.,* Appellants, *vs.* ALTON WATER COMPANY *et al.,* Appellees.

*Opinion filed May 25, 1962.*

John W. Hoefert, J. F. Schlafly, Jr., and R. Emmett Fitzgerald, all of Alton, for appellants.

Isham, Lincoln & Beale, of Chicago, and Malcolm D. Durr, of Alton, (Charles A. Bane, Arthur C. Gehr, and George B. Beall, of counsel,) for appellee Alton Water Company; and William G. Clark, Attorney General, of Springfield, and Harry R. Begley, Special Assistant Attorney General, of Chicago, for appellee Illinois Commerce Commission.

Mr. Justice Schaefer delivered the opinion of the court:

In *City of Alton* v. *Commerce Com.* 19 Ill.2d 76, we reviewed an order of the Illinois Commerce Commission that had allowed increases in the rates charged by Alton Water Company, a public utility furnishing water services in Alton and neighboring areas. Objections to the company's proposed rate schedules had been filed on behalf of the city of Alton and several large industrial users of water who had intervened in the proceedings before the Commission. After

the Commission had granted rate increases, the intervenors appealed to the circuit court of Madison County. That court "vacated, reversed and set aside" the Commission's order, and the company and the Commission appealed to this court.

The opinion of this court discussed the many issues that had been raised. As to some of them it agreed with the company and the Commission, and as to others it agreed with the intervenors. Our conclusion was that while the circuit court was correct in reversing the order of the Commission, the cause should be remanded to the Commission "for further proceedings in accordance with the views expressed in this opinion."

Thereafter the Commission reconsidered the matter in the light of this court's opinion and entered an order and a supplemental order on remand which reduced by 8.35 per cent the rates the Commission had theretofore approved. An application for rehearing was filed by the intervenors. It was denied, and the intervenors appealed to the circuit court of Madison County. That court affirmed the order of the Commission and the intervenors have brought the case again to this court.

Their position is that under the opinion of this court the Commission was required to hold additional hearings and to receive additional evidence with respect to several issues. And because the Commission reconsidered the matter and entered its orders on remand without further hearings and without affording an opportunity for the presentation of additional evidence, they contend that the Commission failed to comply with the order of this court, and by its failure deprived them of due process of law.

The decisions upon which the appellants rely to sustain their claim that they were denied notice and hearing, and thus deprived of property without due process of law, involved procedural circumstances so different from the one here presented that they need not be discussed. In this case, the Commission conducted lengthy hearings upon proper

notice prior to the entry of its original order. The intervenors participated fully in those proceedings and in the subsequent appeals to the circuit court and to this court. Neither the mandate nor the opinion of this court on the prior appeal expressly directed the Commission to hold further hearings or to receive additional evidence. Our decision in *City of Chicago* v. *Commerce Com.* 4 Ill.2d 554, makes clear that an order of this court directing that a cause be remanded to the Commission does not automatically require additional hearings or evidence. The question in each case is whether additional hearings or evidence are necessary to enable the Commission to comply with the rulings of this court, and we turn to that question.

The intervenors' first complaint concerns the amount allowed for overhead expenses in the computation of reproduction cost for the ultimate purpose of determining the rate base. In its original order the Commission allowed 15 per cent of reproduction cost for overhead expenses. Our opinion decided that general overhead expenses were a proper component of reproduction cost, and that it was acceptable to compute them as a percentage of the cost of physical reproduction. The opinion then continued: "The question remains whether overhead expenses amounting to 15 per cent of the basic reproduction cost are justified in this case. The only testimony bearing on this issue is the conclusion expressed by Howson and Cavanagh that 15 per cent should be included in reproduction cost new and Howson's statement that this figure was supported by the experience of his consulting engineering firm. However, the Commission's counsel conceded on oral argument that he knew of no instance in which the Commission had theretofore allowed so high a percentage. An unusually high percentage can not be justified in terms of generally rising costs, because the present level of costs is already reflected in the basic reproduction cost, of which the overhead item is a percentage. If there are other grounds that support an in-

crease in the percentage of permissible overhead, they should appear from evidence more specific than the bare conclusions of the witnesses." 19 Ill.2d at p. 82.

As the opinion indicates, our concern was with the allowance of what was then conceded to be an abnormally high percentage of reproduction cost for overhead expenses, and it was to that problem that our remarks were directed. In its order on remand, the Commission has explained in considerable detail the basis of its computations. While it restated its belief that the record sustained an allowance of 15 per cent, it nevertheless recomputed on the basis of an allowance of 12 per cent. It appears that this allowance is not unduly high, and the evidence already in the record sustains it. The Commission therefore did not err with respect to this matter.

Since January 1, 1954, the company has been depreciating its current property acquisitions, for Federal income tax purposes, at an accelerated rate, as is permitted by section 167 of the Internal Revenue Code of 1954. (26 USCA 167.) This method of depreciation results in reduced taxable income in the early years of the life of the property, and increased taxable income in the later years. The Commission's original order allowed the company to treat as an operating expense amounts currently accrued as a reserve to meet the deferred tax liability. Our opinion upheld the Commission's accrual of deferred tax expenses but held that funds generated by the accruals must be deducted from the rate base. On remand the Commission found that the amount of taxes deferred due to the use of accelerated depreciation did not exceed $26,350.

The record shows that the amount of deferred taxes for the 12-month period ending October 31, 1956, was $9,300, but it does not show the exact amount for the entire period during which the company was using accelerated depreciation, January 1, 1954—October 31, 1956. The intervenors

maintain, therefore, that it was imperative that the Commission hear additional evidence. We do not agree.

An exhibit in the original record shows the cost of additions to the company's tangible plant in service for each of the years 1954, 1955, and 1956. These additions would certainly account for all but a very minute percentage of the acquisitions that would be subject to accelerated depreciation. With respect to the acquisitions listed in that exhibit it appears that the amount of the reserve, for the full three-year period, would be $18,650. The amount computed for tax deferrals by the Commission, $26,350, was thus more than adequate on the basis of evidence already in the record. A more precise figure could have been determined if the record had been supplemented on remand with additional evidence, but any error in the Commission's computations operated to the advantage of the intervenors, and they have no cause for complaint.

They contend, however, that under our opinion it is not sufficient to deduct from the rate base the dollar amount of the reserve for deferred taxes. They apparently argue that the Commission must deduct from the rate base not only the reserve, but also the value of assets purchased with funds generated by use of accelerated depreciation. This contention is clearly unsound. Our prior ruling was that the benefit of the deferrals should be enjoyed by the rate payers, not the stockholders of the utility. To this end, the funds reflected in the reserve must be isolated from the rate base. But this does not mean that both the dollar amount of the reserve and the value of assets purchased with deferred tax funds must be deducted from the rate base. We see no basis for such a double deduction.

The intervenors may be suggesting that because the Commission determines rates on the basis of the fair value of the utility's assets rather than their original cost, a simple deduction of the dollar amount of the deferred tax reserve

will not be adequate for all time and under all conditions. If this is the intervenors' point, we agree with it, but we do not agree that this issue is presented for decision here. As we have noted, the Commission's allowance for deferred taxes of $26,350 was greatly in excess of the actual taxes deferred. Although the Commission did not derive this larger figure by adjusting the deferred tax reserve to a fair value figure, the amount that it allowed is sufficient to include any increases from such an adjustment, whatever method might be employed for the adjustment. It will be time enough to consider the difficult problem of the proper method of reflecting income tax deferrals in the rate base when the Commission has expressly ruled on these problems in a case presenting a real economic controversy.

In our former opinion we also discussed the contention that the revenue of the company would be increased through improved maintenance of water meters and by the introduction of metered rates for customers who had been receiving water at flat rates. Concerning these matters our opinion stated: "Although, as we have indicated, it seems reasonable to expect some increase in income from these two items, the evidence bearing upon them is so incomplete that it is difficult to determine whether increases will actually result and, if so, how great they will be. Since the case must be remanded to the Commission on other issues, it will have an opportunity to apply its experience in solving the difficult problems of prediction that are involved." 19 Ill.2d at pp 92-93.

Upon remand the Commission reconsidered these matters. It estimated that additional income of $7,500 would be received by placing flat rate customers upon a metered basis, and the intervenors do not challenge this finding. The Commission also found that additional revenue of $42,500 could be anticipated from improved maintenance of the company's meters. The intervenors assert that the record

does not contain evidence to support this finding, and that the amount found by the Commission is too low.

What is involved here is the difference between the total amount of water pumped into the system and the total amount of water billed to consumers. During the test year, when the company inspected and repaired almost the required number of meters, unbilled water amounted to approximately 20 per cent of the total water pumped; in earlier years when the company had inspected and repaired a smaller number of meters, the percentage of unbilled water was significantly higher. In arriving at its conclusion that increased revenues of $42,500 could be anticipated from proper maintenance of increasing numbers of meters, the Commission apparently decided that the amount of unbilled water could be reduced from 20 to 15 per cent of the total pumped into the system, since a 5 per cent increase in the amount of water billed at the system average rate would produce $42,107.10 in increased revenues.

In reaching this decision, the Commission pointed out that not all unbilled water is the result of faulty meter maintenance, because, for example, water that is furnished to municipalities for use in fire protection and other municipal services is not billed. The Commission also stated that its experience shows that "well-operated and well-maintained water utilities will suffer losses ranging from 15 to 20 per cent." So it appears that in determining the amount of increased revenues to be produced by improved meter maintenance, the Commission has computed its figures on the assumption that the company will lose no more water than the most efficient of "well operated and well maintained water utilities."

The amount of water that will not be billed because of faulty meters, and the increase in billed water that will result from improved maintenance are impossible to determine with precision. The process of prediction requires experi-

ence and expert judgment. The Commission could have sought the assistance of expert witnesses in additional hearings on remand, but our opinion did not require it to do so. Instead we stated: "Since the case must be remanded to the Commission on other issues, it will have an opportunity to apply its experience in solving the difficult problems of prediction that are involved." (19 Ill.2d at 93.) The Commission has complied with the direction of this court, yielding on doubtful points to the intervenors. This was not error of which the intervenors can complain.

The intervenors contend, however, that although the Commission's conclusion regarding the increase in water billed may be correct, its computation of revenue arising from this increase is not. Before the Commission on remand and before the circuit court, as well as in their original brief in this court, the intervenors argued that the Commission had computed the amount of increased revenue that would come from improved meter maintenance on the basis of the company's old rates instead of the higher rates established by the Commission in this proceeding. In their reply brief in this court they abandoned this argument and shifted to a new contention that about one third of the water pumped into the system is used by large industrial consumers whose meters have been properly maintained, and that the revenue anticipated from improved maintenance should therefore have been computed, not at the system average rate, but at the higher rate applicable to domestic users.

But the Commission considered this problem under the direction of this court to apply its experience in predicting increased revenues. It had before it evidence concerning the company's rate structure, the consumption of water by various classes of customers, the amount of unbilled water, and testimony concerning the company's meter maintenance program. Under the circumstances on remand, this was sufficient evidence to support the Commission's use of the system average rate in finding that increased revenues would not

exceed $42,500. The Commission's approach is not rendered erroneous because the evidence does not negate every other hypothesis which might produce a different result. The intervenors' unsupported assertion, made in their reply brief only after their earlier contention had proved untenable, that only domestic billings would be increased by improved meter maintenance, does not persuasively challenge the validity of the Commission's action.

It follows, therefore, that the circuit court of Madison County correctly affirmed the orders of the Commission, and its judgment is affirmed.

*Judgment affirmed.*