CENTRAL ILLINOIS LIGHT COMPANY *et al.*, Appellants, v. ILLINOIS COMMERCE COMMISSION *et al.*, Appellees (Roland E. Burris, Illinois Attorney General, *et al.*, Respondents).

Third District   Nos. 3—91—0745, 3—91—0786, 3—91—0800, 3—91—0808 cons.

Opinion filed January 22, 1993.—Supplemental opinion filed on denial of rehearing December 30, 1993.

W. Michael Seidel, of Defrees & Fiske, of Chicago, and Scott A. Cisel, of Central Illinois Light Company, of Peoria (Edward J. Griffin, of counsel), for Central Illinois Light Company.

Larry Jones, E.M. Fulton, and Harold L. Stoller, all of Illinois Commerce Commission, of Springfield (James E. Weging and Susan Weidel, Special Assistant Attorneys General, of counsel), for Illinois Commerce Commission.

Karen Lusson, of Citizens Utility Board, of Chicago, for Citizens Utility Board.

M. Kathleen Nolan, of Illinois Office of Public Counsel, of Chicago, for Office of Public Counsel.

Eric Robertson and Randall Robertson, both of Lueders, Robertson & Konzen, of Granite City, for Caterpillar, Inc.

Laurie M. Judd and Douglas S. Slayton, both of Kavanagh, Scully, Sudow, White & Frederick, of Peoria, for Board of Education of City of Peoria School District No. 150, Board of Education of Farmington Central Community Unit School District No. 265, Board of Education of Illini Bluffs Unit School District No. 327, and Board of Education of Washington School District No. 50.

JUSTICE STOUDER delivered the opinion of the court:

Central Illinois Light Company (CILCO) filed a petition with the Illinois Commerce Commission (the Commission) on February 22, 1990, to increase rates for its gas service. The new rates were designed to increase annual operating revenues by approximately $14,486,000—about 10.61%—based on CILCO's forecast of its revenue requirement for 1991, the test year. In addition, CILCO sought the Commission's approval of a rider tariff to recover the costs of cleaning up coal tar deposits at up to five sites of former gas manufacturing plants. The plants involved in this effort operated between approximately 1850 until sometime in the 1940's, and no action was taken to remediate potential environmental damage from the dumping of coal tar until 1986.

After an extensive hearing, on January 16, 1991, the Commission issued its order approving rate increases by 9.96%, or approximately $12,936,000 before revenue taxes, per year. Although initially the Commission deferred CILCO's coal tar rider tariff request for later consideration at a generic proceeding, on reconsideration the Commission entered an order on August 2, 1991, granting CILCO's request.

These appeals were brought to the appellate court directly from the administrative proceedings pursuant to Supreme Court Rule 335 (134 Ill. 2d R. 335) and section 10—201(a) of the Public Utilities Act (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 10—201(a)). In addition to CILCO, intervenors in the administrative proceeding, including several boards of education, the Office of Public Counsel (OPC) and the Citizens Utility Board (CUB), are appellants before this court. Caterpillar, Inc., another intervenor, appears before us as an appellee. Intervenors Attorney General Roland E. Burris, the City of Peoria and the County of Peoria are not parties to the appeal.

In this consolidated appeal, CILCO takes issue with: (1) the Commission's rejection of CILCO's updated information on its investment

in rate base for the test year; (2) the Commission's deduction from rate base of certain accumulated deferred income taxes (ADITs); and (3) the Commission's decision to deny CILCO's request to include unamortized rate case expenses in rate base. The school boards take issue with: (1) the Commission's decision to grant a 32.6% rate increase for most of CILCO's natural gas transportation customers; and (2) the Commission's decision to grant CILCO's request to recover the costs of coal tar cleanup in its rider tariff (Rider TAR). The Office of Public Counsel and CUB join in the boards' challenge to Rider TAR.

The Commission's role in setting rates and the proper standard for reviewing its orders were cogently set forth by our supreme court in *People ex rel. Hartigan v. Illinois Commerce Com'n* (1992), 148 Ill. 2d 348, 366-67, 592 N.E.2d 1066, 1074:

> "The Commission is the administrative agency responsible for setting rates that public utilities may charge their customers. (Ill. Rev. Stat. 1985, ch. 111⅔, pars. 9—102 through 9—202; *Hartigan I* [(1987),] 117 Ill. 2d [120, 142].) The Commission is the fact-finding body in the ratemaking process. (*Hartigan I*, 117 Ill. 2d at 142.) It is governed by the Public Utilities Act (Act) (Ill. Rev. Stat. 1985, ch. 111⅔, par. 1—101 *et seq.*) and the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1985, ch. 127, par. 1001 *et seq.*). The Commission's powers are limited to those granted by the legislature in the Act. *Business & Professional People I* [(1989)], 136 Ill. 2d [192, 201].
>
> Because the Commission is an administrative agency, judicial review of its orders is limited. (*Business & Professional People I*, 136 Ill. 2d at 204.) Although the Commission is not required to make findings regarding every step, its findings of fact must be sufficient to allow for informed judicial review and will be affirmed if they are based on substantial evidence in the record. (See Ill. Rev. Stat. 1985, ch. 111⅔, pars. 10—201(e)(iii) through (e)(iv); *Yowell v. Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* (1935), 360 Ill. 272, 275-76.) The Commission's findings of fact are *prima facie* correct and will not be overturned by a reviewing court unless they are against the manifest weight of the evidence, beyond the Commission's statutory authority, or violative of constitutional rights. (*Citizens Utilities Co. v. Illinois Commerce Com'n* (1988), 124 Ill. 2d 195, 206; *Independent Voters v. Illinois Commerce Com'n* (1987), 117 Ill. 2d 90, 95.) Moreover, the burden of proof is on the party appealing the Commission's order. Ill. Rev. Stat. 1985, ch. 111⅔, par. 10—201(d)."

# I.

## CILCO'S UPDATED EVIDENCE OF REVENUE REQUIREMENTS

Initially, we find that the Commission did not err in rejecting CILCO's updated revenue needs for the 1991 test year. When CILCO filed its rate case in February 1990, its letter to the Commission stated: "The new schedules are designed to provide additional base rate revenues of approximately $14.5 million annually based upon a forecasted test year ending December 31, 1991, which represents an overall increase in revenues of 10.6 percent." At that time, CILCO applied budget information available from the fourth quarter of 1989 for forecasting 1991 construction requirements. Subsequently, in July 1990, during the testimony of Robert Sprowls, CILCO's treasurer, updated evidence of the construction requirements was admitted. The new evidence was based on information then available for the first quarter of 1990 and showed an increase of approximately $2.9 million for 1990 and projected a $3.0 million increase for 1991.

According to Sprowls, the increased construction expenditures related primarily to the construction of new gas mains and service lines necessitated by the widening of streets, the relocation of sewers, the development of new subdivisions, the replacement of older gas mains in the City of Springfield and the replacement of mains in the Peoria area. After subtracting out that portion of the projected increase relating to the installation of a new electric generating unit, which was being deferred, the witness proposed that CILCO's net investment in 1991 rate base be increased by approximately $5.5 million to accommodate the new construction requirements.

In its final order denying CILCO's request to include the updated evidence in its rate base, the Commission stated:

"While the nature and amounts of these increases were well documented by Company witnesses, the Commission does not believe that the ratemaking process is well served when updates prepared during the rebuttal stage of the hearings result in such substantial increases over prior forecasts of costs which have the effect of increasing the utility's revenue requirement. Absent a showing that increases of this magnitude could not reasonably have been foreseen at an earlier time such as when the rate case filing or supporting forecasts were prepared, the Commission does not believe that a utility should be permitted to increase or rehabilitate its revenue requirement in this manner over objections by witnesses for another party."

■ Although by rule the Commission may permit a utility to update its filing for significant and material changes during the suspension period (83 Ill. Adm. Code §285.150(d) (1991)), it is not required to do so. Updated filings should be presented in accordance with a schedule established during the proceedings so as to allow staff an opportunity to review the filing, particularly, as here, where the change is significant. In this case, it is not at all clear from the record on appeal that CILCO's update was presented in a timely manner. Any agreement among the parties as to CILCO's intention to present updates for the test year was not made a part of this record. The updated information was available to CILCO in April 1990, but not revealed to the other parties until Sprowls testified on cross-examination in July 1990. Moreover, as argued by CUB, it appears that the $5.5 million increase proposed by CILCO for construction updates failed to account for other undisputed downward adjustments proposed by Commerce Commission staff and witnesses for the intervenors that could have affected the test year revenue requirement. Under the circumstances, we find that the Commission's decision to reject the updated test year filing is not contrary to the manifest weight of the evidence and should be affirmed.

## II.

### DEDUCTION OF ADITs RELATED TO PREPAYMENT OF PENSION EXPENSES

Next, CILCO contends that the Commission acted arbitrarily and unreasonably in deducting from rate base accumulated deferred income taxes (ADITs) related to the prepayment of pension expenses. Income taxes are operating expenses which a utility is permitted to recover through its rates as a cost of providing services. Deferred income taxes are accumulated by the utility as a result of differences between the time the utility recovers the taxes through its rates and the time the taxes are paid. Because the taxes are supplied by ratepayers, they represent cost-free capital available to the utility for investment and should not earn a return for the benefit of the shareholders. For this reason, ADITs are deducted from the regulated utility's rate base. *City of Alton v. Commerce Comm'n* (1960), 19 Ill. 2d 76, 165 N.E.2d 513.

In this case, CILCO did not deduct about $1.2 million of ADITs related to prepayment of pension expenses. According to CILCO, the utility made advance payments to the company pension fund in 1986 and 1987 in anticipation of a reduction in corporate income taxes after 1986. CILCO reasoned that since the pension payments were ad-

vanced with shareholder funds the ratepayers were not entitled to a deduction for ADITs related to the pension payments. Witnesses for the intervenors and Commerce Commission staff, however, opined that since the pension prepayment resulted in higher book entry income taxes than were actually paid to the taxing authorities and the ratepayers prepaid the tax expense to the utility, the ADIT deduction properly belonged to the ratepayers. The Commission found the latter theory reasonable and accepted the recommendation that ADITs related to the pension prepayments be deducted from rate base. We agree.

■ In our opinion, the ADITs, whether property related or not, are properly deducted from rate base because the utility's income taxes are paid for with ratepayer funds, not shareholder funds. Even though the underlying pension fund prepayment was made with shareholder funds, to deny the ratepayers a deduction for ADITs related to nonproperty expenses would result in an unwarranted return on money that the shareholders did not invest in the company. We affirm the Commission's order allowing the deduction.

## III.

### EXCLUSION FROM RATE BASE OF UNAMORTIZED RATE CASE EXPENSES

■ Finally, CILCO argues that the Commission acted arbitrarily and contrary to law in denying the utility's request to include the unamortized portion of CILCO's rate case expenses in rate base. The Commission determined to amortize rate case expenses over a five-year period instead of three years as proposed by CILCO. In its order, the Commission explained that if the amortization period is too short, the utility over-recovers its expenses; whereas, if it is too long, the remaining unamortized expenses can be recovered in a subsequent rate case.

By including the unamortized rate case expenses in rate base, CILCO sought to recover the financing costs associated with the expenses. As explained by CILCO witness Sprowls, the utility loses the time value of money paid to present its rate case if rate base treatment is not accorded the unamortized balance. Staff and witnesses for the intervenors, on the other hand, recommended excluding the unamortized portion of rate case expenses from rate base so as to provide an equitable sharing of rate costs between ratepayers and shareholders. Both sides cited prior decisions of the Commission in support of their positions.

We have reviewed the testimony of record and find that the Commission's determination in this case is sufficiently supported by credible evidence and is neither contrary to law nor arbitrary and capricious. Accordingly, we affirm the Commission's decision to exclude unamortized rate case expenses from rate base.

### IV.

APPROVAL OF 32.6% RATE INCREASE FOR TRANSPORTATION CUSTOMERS

We turn next to the school board intervenors' appeal. All of the school board intervenors were considered "transportation" customers—that is, they purchased their natural gas from another supplier and contracted with CILCO to move the gas through its system from the point where CILCO hooks up to an interstate pipeline to the customer's facility. Transportation customers were given the option of relying solely on the gas purchased independently or purchasing back-up gas from CILCO on a limited or unlimited basis.

Prior to the rate increase here at issue, transportation customers paid 7 cents per therm for the distribution charge plus the cost of back-up gas if that service was selected. Testimony admitted at the hearing established that CILCO's cost to distribute gas to the transportation customers was 6.33 cents. Under the new rates proposed by CILCO, the customers were split into two classes, "general" (Rate 2) and "large" (Rate 3) customers. The rates for transportation customers are determined by applying companion "riders" to the class rates. The school board intervenors qualify only for the general rate and their rate as transportation customers is determined under either Rate 2, Rider 28 (with no back-up or limited back-up service) or Rate 2, Rider 29 (with unlimited back-up). Rate 3 transportation customers' rates are determined under Rider 30.

The percentages of increase/decrease proposed by CILCO and approved by the Commission for the various categories of customers are at the heart of the school boards' arguments challenging their new rates. The approved increase applicable to general nontransportation customers is 3.8%, whereas large nontransportation customers receive a 27% decrease. Rider 28 and Rider 29 transportation customers' rates will increase by 32.6%, whereas Rider 30 large transportation customers will have a 27% decrease in their rates.

Section 9—201(c) of the Public Utilities Act requires the Commission to determine rates and other charges and classifications that are "just and reasonable." (Ill. Rev. Stat. 1989, ch. 111⅔, par. 9—201(c).) On appeal, this court is required to reverse a decision of the Commis-

sion "in whole or in part" if we find that the Commission's findings "are not supported by substantial evidence based on the entire record of evidence presented to or before the Commission for and against such *** decision." Ill. Rev. Stat. 1989, ch. 111²/₃, par. 10—201(e)(vi)(A).

The crux of the school boards' argument is that there was no evidence admitted at the hearing quantifying CILCO's position that the large transportation customers with a "high load factor" (representing constancy in gas usage throughout the year) had been subsidizing the "low load" transportation customers, such as the school boards. The evidence showed that cost of service to transportation customers was 6.33 cents per therm and that they were paying 7 cents per therm prior to the filing of this rate case. Therefore, the argument continues, the 32.6% rate base increase applied to them is arbitrary and must be reversed. CILCO and Caterpillar respond that the premise of the school boards' argument ignores the critical fact that the 6.33 cent cost-of-service figure represents the average cost of serving *all* transportation customers, not just the low load transportation customers. As such, CILCO reasons, the school boards' reliance on this singular factor is misplaced. We agree.

Consideration of the cost-of-service factor alone does not guarantee a just and reasonable rate schedule. As stated in *Cerro Copper Products v. Illinois Commerce Comm'n* (1980), 83 Ill. 2d 364, 371-72, 415 N.E.2d 345:

> "The fundamental purpose of providing a particular rate schedule is to generate a rate of return which the Commission has approved as just and reasonable and which will enable the utility to continue operation at an acceptable level of operating income. Many and complex factors must be considered. The fair value of the utility's property, the existing capital-formation structure, the proposed financing for any construction programs, original cost rate base, operating expenses, revenue and income, and the cost of providing *** service to the various classifications of consumers must be examined before the Commission issues an order and announces a schedule of rates."

We have reviewed the record on appeal and find that the Commission's approval of CILCO's rate design for its transportation customers is supported by substantial evidence. The only cost-of-service study admitted into evidence in this case was conducted by CILCO. When the transportation option was originally offered by CILCO in the 1980's, it was designed for a single customer. However, by the time that this rate case was filed, about 43% of CILCO's delivery of

gas represented transportation service. These customers realized an immediate 50% reduction in their base rate charges by making the switch from general to transportation service, and CILCO began to realize losses of revenue.

The embedded cost-of-service study was performed to categorize CILCO's customers and costs depending, *inter alia*, on their demands on CILCO's gas system, the volumes of gas delivered to them and the number of customers in each category. The study and testimony relating thereto established that residential customers were being undercharged and that the large industrial customers who used the gas system more consistently and efficiently (the high load factor customers) had made a greater contribution to payment of fixed costs than had the smaller, low load factor customers. Accordingly, CILCO's new proposed rates were designed to bring the base rates charged to the various classes of customers closer to cost of service by decreasing the base rate for those customers which had substantially subsidized the low load factor customers and increasing the rates for the low load factor customers sufficiently to provide a reasonable rate of return for the utility's shareholders.

Obviously, given the disparities demonstrated by CILCO's study, an across-the-board percentage increase in rate base to all customer classes would not have been just or reasonable. We do not agree with the school boards that the record is deficient in its evidentiary justification for the various percentage changes for the utility's customers or that the customers were arbitrarily categorized for purposes of CILCO's rate schedule. In our opinion, the evidence of record amply supports the Commission's ultimate conclusion that the rate design for transportation customers, as recommended by CILCO and the Commission staff, is fair and reasonable.

## V.

### RECOVERY OF COAL TAR CLEANUP COSTS

The intervenor school boards, CUB and OPC also challenge the Commission's decision on rehearing to grant CILCO's requested Rider TAR. The rider allows CILCO to recover from ratepayers the cost of cleaning up certain coal tar environmental hazards.

The record shows the coal tar deposits are located at the site of previous manufactured gas plants (MGPs). These plants operated between approximately 1850 and 1950. In these plants gas was "produced" from coal or coke. As a by-product of this process, waste products such as coal tar, coal tar sludge, coking liquors, coke oven

gas condensates, gas purification waste and crude coal oil were produced. These wastes were for the most part stored or buried on site. When these plants were decommissioned, the above-ground structures were for the most part razed, while the below-ground structures were filled with demolition debris and covered with clean fill materials.

Some two or three decades later, Congress passed the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (42 U.S.C. §9601 et seq. (1980)), commonly known as Superfund. The Act authorizes State and Federal governments to institute actions for the containment, cleanup and removal of hazardous wastes. (42 U.S.C. §9604 (1980); *United States v. Reilly Tar & Chemical Corp.* (D. Minn. 1982), 546 F. Supp. 1100.) The State of Illinois has enacted similar legislation. (See Ill. Rev. Stat. 1991, ch. 111½, par. 1020 et seq.) The Illinois Environmental Protection Agency (IEPA) has encouraged Illinois utilities to investigate and voluntarily remediate coal tar pollution, in order to avoid formal proceedings by the agency. In the instant case, CILCO's actions regarding the cleanup of coal tar wastes have been on a voluntary basis. No action has been brought by the State of Illinois or the United States Government.

CILCO became aware of the possible hazardous waste problem at the former MGP sites in 1984. CILCO identified four possible sites in its service area. It was determined that the wastes posed no immediate threat to the public or the environment. While excavating at one of these sites in 1986, CILCO discovered contaminated soil. Following an investigation of the problem, and working in cooperation with the IEPA, CILCO has moved toward remediation of the problem at this site. CILCO plans to clean up each site one site at a time.

In the instant proceedings, CILCO proposed to recover all payments to outside vendors incurred in the investigation and cleanup of former MGP sites through a rider, designated Rider TAR. The intervenors opposed CILCO's proposed recovery from ratepayers, and in the alternative proposed other mechanisms for recovery from both ratepayers and shareholders.

In its January 16, 1991, order, the Commission accepted the recomendation of staff that the decision on the coal tar issue would best be addressed industry-wide in a "generic" proceeding. The Commission therefore denied approval of CILCO's Rider TAR request. The Commission subsequently granted CILCO's application for rehearing, and further hearings were held on the coal tar issue. We note that on the same day the Commission granted CILCO's application for rehearing, the Commission also initiated on its own motion a "generic" proceeding on the coal tar issue.

In its August 2, 1991, order on rehearing, the Commission, with three members dissenting, found the cleanup costs were current and legitimate business expenses mandated by State and Federal environmental laws. The Commission noted that under general principles of ratemaking, current and legitimate business expenses which are reasonably incurred are to be recovered from the utility's ratepayers. The Commission found that although these costs did not "clearly fit" within the Act's stated policy of recovery of costs from those who cause the costs to be incurred (see Ill. Rev. Stat. 1991, ch. 111²/₃, par. 1—102(d)(iii)), the Commission concluded the remediation costs were not sufficiently different or extraordinary to require deviation from the general rule. The Commission found the best mechanism for recovery of such costs was a rider with a prudency review provision.

Under the rider, CILCO will also be able to recover the carrying charges on the unamortized balance of the costs incurred through August 2, 1991. The costs incurred prior to August 2, 1991, are to be spread over the remaining months of 1991 and the 12 months of 1992, and are to be recovered by the end of 1992. Costs incurred after August 2, 1991, are to be recovered on a 12-month basis. As a result of the allowance of carrying charges and the recovery of subsequent costs as they are incurred, ratepayers will bear 100% of the recoverable costs.

On appeal, the intervenors contend the Commission erred as a matter of law and violated the policy of the Act in granting CILCO's Rider TAR request.

▆ As an initial matter, we note the Commission reached a decision in the "generic" coal tar proceeding on September 30, 1992 (see Illinois Commerce Commission on its Own Motion—Investigation Concerning Issues Related to Coal Tar Cleanup Expenditures (September 30, 1992), Nos. 91—0080 through 91—0095). In that decision, the Commission concluded that neither the shareholders nor the ratepayers should bear the full burden of coal tar cleanup expenditures. The Commission specifically found no "legal requirement" that ratepayers absorb all cleanup costs and that equity required a sharing of such costs between ratepayers and shareholders.

None of the parties have brought this decision to our attention; therefore, no arguments have been presented to show what effect, if any, this decision should have on our ruling.

This court is struck by the fact that the exact same arguments and reasoning specifically rejected in CILCO's case were adopted by the Commission majority in the generic proceeding as the basis for its ruling. We acknowledge the Commission is under no legal

duty to adhere to its own previous orders. "The concept of public regulation includes of necessity the philosophy that the commission shall have power to deal with each situation as it comes before it, regardless of how it may have dealt with a similar or even the same situation in a previous proceeding." (*Mississippi River Fuel Corp. v. Illinois Commerce Comm'n* (1953), 1 Ill. 2d 509, 513, 116 N.E.2d 394, 396-97.) However, these two cases were proceeding in tandem with each other. Why the utility-specific CILCO case was resolved prior to the resolution of general issues in the generic case is puzzling to this court.

The parties in this proceeding have argued the question of who should bear these costs is a legal issue contingent on statutory authority. The Commission has decided this legal issue in a conflicting manner. Thus, it is rather likely that the courts will be confronted with two Commission decisions which are diametrically opposed to each other. In order to avoid unduly conflicting judicial decisions, we believe that in the interest of judicial economy this cause should be remanded to the Commission for further consideration of the coal tar issue in light of the Commission's recent ruling in the generic proceeding.

Therefore, we affirm the Commission's order of January 16, 1991; however, we reverse the Commission's order on rehearing dated August 2, 1991, and remand to the Commission for further proceedings in light of its decision in the generic coal tar proceeding.

Affirmed in part; reversed in part and remanded.

SLATER, J., concurs.

JUSTICE BARRY concurring in part and dissenting in part:

I subscribe fully to my colleagues' disposition of issues I through IV in this appeal. I do not, however, concur in their apparent approval of the Commission's ultimate decision to pass along to CILCO's ratepayers all or part of the costs of cleaning up the utility's 50-year-old coal tar deposits (issue V).

In its original order of January 16, 1991, the Commission stated:

> "The Commission has carefully reviewed the evidence and arguments presented by all parties. While noting that the issue has been well analyzed by CILCO in its testimony and briefs, the Commission is of the opinion that the recommen-

dation of Staff should be adopted. Given the nature and statewide scope of the issue, a determination of the proper ratemaking treatment relative to the recovery of cleanup costs can best be addressed in a generic proceeding, provided that these expenditures are accounted for in a manner that would allow CILCO to preserve the opportunity to recover such costs, including carrying costs, if and to the extent the Commission decides that such recovery is appropriate. Under Staff's proposal, these costs would be accounted for in such a manner. The Commission also agrees with Staff that the carrying charge should be set at the after tax cost of capital. The Commission would add that Staff's proposal for a generic proceeding is especially appropriate where, as in the instant case, the Company is seeking approval to recover costs through a PGA type mechanism which would continually pass through costs to ratepayers without the scrutiny of a rate proceeding. The Commission concludes that CILCO's proposal to implement Rider TAR should not be approved at this time."

Subsequently, the Commission granted CILCO's application for rehearing and entered its final order on August 2, 1991, approving Rider TAR. In the order the Commission finds that the coal tar cleanup costs are "current and legitimate business expenses reasonably incurred" and that they are not "extraordinary by their nature or sufficiently different to require a deviation from the general rule that [such] expenses reasonably incurred are subject to recovery from ratepayers." Three of the commissioners dissented. Having carefully reviewed the record on appeal, I would reverse the Commission's order on rehearing granting CILCO's request to recover its coal tar cleanup expenses from the ratepayers.

The Commission is an administrative agency governed by the Public Utilities Act (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 1—101 *et seq.*) and the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1989, ch. 127, par. 1001 *et seq.*). Its rate-setting authority is limited to powers granted by the legislature in the Public Utilities Act. (*People ex rel. Hartigan v. Illinois Commerce Comm'n*, 148 Ill. 2d at 366, 592 N.E.2d at 1074.) It is the declared policy of this State to provide "environmentally safe and least-cost public utility services *** which are equitable to all citizens." Goals of regulation include ensuring environmental quality and equitable treatment of consumers and investors. With respect to the latter, this State's objective is to allocate the cost of supplying public utility services "to

those who cause the costs to be incurred." (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 1—102(d)(iii).) In presenting its rate case before the Commission, a regulated utility "has the burden of proving that any operating expense for which it seeks reimbursement directly benefits the ratepayers or the services which the utility renders." (*Candlewick Lake Utilities Co. v. Illinois Commerce Comm'n* (1983), 122 Ill. App. 3d 219, 227, 460 N.E.2d 1190, 1196, citing *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1973), 55 Ill. 2d 461, 303 N.E.2d 364.) The Commission's interpretations of law, unlike determinations of fact, are not binding on a reviewing court. *Hartigan*, 148 Ill. 2d at 367, 592 N.E.2d at 1074.

By my view, the Commission erred in its determination as a matter of law that the coal tar cleanup costs are recoverable from current ratepayers. Contrary to the Commission's finding, the coal tar cleanup costs here at issue are an "extraordinary" expense. The cause of the expense is the utility's decision to dispose of hazardous waste deposited on the sites of manufactured gas plants more than 50 years ago. This is not a case of installing environmental controls for the current operation of the utility. Were such the case, the Public Utilities Act clearly authorizes the recovery of prudently and reasonably incurred costs. See Ill. Rev. Stat. 1989, ch. 111²/₃, par. 1—102(b)(ii).

Nor does the mere fact that the utility failed to recognize the environmental impact of its practice until some 40 to 50 years later and is now mandated by Federal and State law to clean up the sites convert the cleanup costs into current business expenses which inure to the benefit of current ratepayers. If anything, the costs expended to clean up coal tar deposits inure primarily to the benefit of the utility's property owners—*i.e.*, the shareholders—and secondarily to the general citizenry of this State. The cleanup is unrelated to the providing of current utility service. Therefore, evidence that the utility's past practices of disposing of the waste were deemed reasonable 50 years ago or that the manufactured gas plants were decommissioned in a reasonable and prudent manner cannot be used to justify the utility's theory that current ratepayers should bear the burden of paying for the cleanup.

In my opinion the Public Utilities Act provides no authority for the utility's recovery of "extraordinary" expenses neither related to supplying current services nor caused by current consumers of the utility's services. I would hold that the Commission exceeded its statutory authority in approving CILCO's request to charge its consumers for any of the utility's coal tar cleanup costs.

## SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

JUSTICE STOUDER delivered the opinion of the court:

On January 22, 1993, this court filed an opinion (Justice Barry, dissenting) in this case affirming the Commission's order of January 16, 1991. However, we reversed and remanded the Commission's August 2, 1991, order on rehearing before the Commission which dealt solely with the proper ratemaking treatment of coal tar remediation costs.

■ Previously, while this case was under advisement, this court became aware of the Commission's September 30, 1992, decision in what was termed the "generic coal tar case." (Illinois Commerce Commission on its Own Motion—Investigation Concerning Issues Related to Coal Tar Cleanup Expenditures (September 30, 1992), Nos. 91—0080 through 91—0095.) Also while this case was under advisement, the parties to the generic case filed appeals from the September 30 generic order. (The Illinois Supreme Court subsequently ordered the appeals consolidated in this district.) Noting the conflict between the Commission's decision in the instant case and the Commission's decision in the generic case, we initially ordered the cause remanded to clear up the conflict. CILCO filed a petition for rehearing which, *inter alia*, challenged this court's remandment of the coal tar issue.

We have now addressed the coal tar issue on the merits in the generic case, finding the Commission had the authority to work a "sharing" of coal tar remediation costs between ratepayers and utility shareholders. (*Central Illinois Light Co. v. Illinois Commerce Comm'n* (3d Dist. December 29, 1993), No. 3—92—0864 (Justice Barry, dissenting).) Having approved the Commission's action in the generic case, we believe the cause in the instant case should now be remanded, and direct the Commission to reconsider the facts and enter an order consistent with the generic order.

Therefore, as modified we affirm the Commission's order of January 16, 1991; reverse the Commission's order on rehearing dated August 2, 1991, and remand the cause, with directions, to the Commission for further proceedings in light of our decision in case No. 3—92—0864; otherwise, CILCO's petition for rehearing in the instant case is denied.

Affirmed in part; reversed in part and remanded with directions; petition for rehearing denied.

SLATER, J., concurs.