(No. 35870.—

THE VILLAGES OF MILFORD *et al.,* Appellants, *vs.* ILLINOIS COMMERCE COMMISSION *et al.*—(CHAMPAIGN COUNTY TELEPHONE COMPANY *et al.,* Appellees.)

*Opinion filed December 1, 1960.*

Fleming & McGrew, of Watseka, for appellants.

William L. Guild, Attorney General, of Springfield, and Harry R. Begley, Assistant Attorney General, of Chi-

cago, (ROBERT J. ELLIS, of counsel,) for appellee the Illinois Commerce Commission; and ISHAM, LINCOLN & BEALE, CHARLES A. BANE, and ARTHUR G. GEHR, all of Chicago, and JAMES L. CAPEL, of Champaign, for appellee Champaign County Telephone Company.

Mr. JUSTICE DAILY delivered the opinion of the court:

Appellants, the villages of Milford, Cissna Park, Woodland, Ogden, Philo, Pesotum and Royal, appeal from a judgment of the circuit court of Iroquois County which confirmed an order of the Illinois Commerce Commission, entered April 8, 1959, allowing an increase in rates of the Champaign County Telephone Company. The latter and the commerce commission are the appellees.

Champaign County Telephone Company, to which we shall refer as the company, is a public utility engaged in the telephone business through 17 exchanges located in the rural areas of Champaign, Iroquois and Vermilion Counties. Organized in the early 1930's, the company originally owned but two small exchanges in Champaign County but, by 1952, had acquired some 15 small, independent exchanges in surrounding villages and counties. Most of the properties were in poor condition, equipment was obsolete, subscribers were interested in better service, and the postwar years brought a rapid increase in the demands for service. In 1952, the company instituted a program of expansion and improvement. Money was borrowed from the Rural Electrification Administration (REA) from time to time in amounts totalling $2,000,000, and such loans were secured by mortgages bearing 2% interest. In addition, the mortgages contain restrictions which preclude the payment of dividends until such time as the equity is at least 10% of the total indebtedness, which require that 18% of the annual income be set aside in a reserve fund for maintenance, and which relate to depreciation reserves.

Between 1952 and 1958, and thus at the time this pro-

ceeding was commenced, all of the exchanges of the company but two, (those located at Ludlow and Seymour,) had been converted to automatic dial operation, and we think it significant to note that no increase in rates was requested until after the improvements had been made. The exchanges at Ludlow and Seymour remained on manual operation, but at the date of the hearings plans and the necessary financing had been arranged for their conversion to automatic systems.

On September 6, 1958, the company filed proposed rates with the commission, which were suspended in accordance with the usual practice, and after several hearings an order was entered granting an increase in rates of $120,000, or 42%. After such increase, the net rates result in a one-party residential line at $5.50 per month, a rural multi-party residential rate of $4.25 a month, and an urban business rate of $8 per month. Upon appeal by appellants, the circuit court of Iroquois County affirmed the order of the commission and this further appeal has followed, with defendants contending that the new rates are unreasonable and unjust for the following reasons: (1) that the rates require consumers to provide for illegal and unreasonable and excessive salaries of the executive officers of the company; (2) that the rates require consumers to provide for unreasonable and unlawful depreciation expenses; (3) that since the company borrowed over $2,000,000 from the Rural Electrification Administration at 2% interest, rates providing for the rate of return under consideration violate the Federal statute pertaining to Rural Electrification Administration loans; (4) that the rates would require subscribers to contribute and pay for a return on the properties used for the benefit of the Ludlow and Seymour exchanges for which exchanges no increased rates were sought; and (5) that the rates were based upon the book cost of the entire company and not the fair value of that part of the

company properties serving subscribers for whom rates were increased, and that the record contains no competent evidence of fair value of the properties of the company.

The limits of judicial review in public utility rate cases, as well as the reasons for such limits, have been fixed by many decisions of this court and we see no useful purpose in unduly extending this opinion by repeating them here. Suffice it to say we have recognized that the determination of rates is not a matter of formulas but one of sound business judgment which has been committed by the legislature to the expert judgment of the commission and, in deference to the judgment of the commission, we have consistently held that its orders in such respect will not be disturbed unless the findings upon which they are based are arbitrary or against the manifest weight of the evidence, or unless in contravention of some established rule of law or constitutional right. (See: *Iowa-Illinois Gas and Electric Co.* v. *Commerce Com.* 19 Ill.2d 436; *Illinois Bell Telephone Co.* v. *Commerce Com.* 414 Ill. 275; *Produce Terminal Corp.* v. *Commerce Com. ex rel. Peoples Gas Light and Coke Co.* 414 Ill. 582; *Peoples Gas Light and Coke Co.* v. *Slattery,* 373 Ill. 31; *Public Utilities Com. ex rel. City of Springfield* v. *Springfield Gas and Electric Co.* 291 Ill. 209; Ill. Rev. Stat., 1959, chap. 111⅔, par. 72). No claim is made here that constitutional rights have been violated, and with the issues for review thus narrowed it is the position of appellees that the commission's finding of fair value is reasonable and supported by substantial evidence; that the rate of return of 4.04% allowed by the commission is just and reasonable and necessary to enable the company to meet REA requirements; that the allowance for operating expenses is reasonable and based upon substantial evidence; and that the allowance for depreciation expenses is reasonable and supported by uncontroverted evidence.

## On the Question of Fair Value

The exhibits, testimony of the company's accountant, and the evidence of the accountant for the commission, who made an independent investigation and who testified in this cause, showed the original cost of the plant to be $2,135,136.37 and the net original cost after depreciation to be $2,027,331.67. This figure was not specified as a "book value" figure but as actual cost. Construction work in progress as of the date in question amounted to $16,056.31 and the fair value was determined, as of the date of the proceeding, (including $30,500 for working capital and materials and supplies) to be $2,073,887.98. While we do not approve so-called "original cost" rate base, the commission properly gave it consideration in connection with "reproduction cost" in determining fair value. There was evidence that the present cost would, for all practical purposes, be substantially the same as original cost because the plant was newly built at current prices and only a small per cent of the original plant, with perhaps a higher reproduction cost, was retained. There was testimony that in excess of 95% of the total amount in the plant account represented the cost of plant installations made within the past five years. The fair value as found by the commission is therefore supported by the evidence and the finding was not contrary to the interests of appellants.

## Rate of Return

It is an unquestioned principle that the commission has the duty and responsibility of fixing rates which will provide a reasonable return on the present value of a utility's property and, in such regard, we have held there can be no particular rate which, in all cases and in all parts of the country, will be regarded as sufficient for the capital invested, but that the compensation must depend on the facts and circumstances in each case. (*Public Utilities Com. ex rel. City of Springfield* v. *Springfield Gas and Electric Co.*

291 Ill. 209.) Here, the commission fixed the rate of return at 4.04%, and it is our opinion that such a rate is neither unreasonable or unjust, nor against the manifest weight of the evidence. Cf. *Iowa-Illinois Gas and Electric Co.* v. *Commerce Com.* 19 Ill.2d 436; where a rate of return of 5.85% was fixed, and *City of Alton* v. *Commerce Com.* 19 Ill.2d 76, where a 5.6% rate of return was approved.

Appellants' principal objection to the rate of return in this case is predicated on the fact that the company has borrowed $2,000,000 from the Rural Electrification Administration at the rate of 2% per annum. They reason that because funds obtained from the agency are public funds to be used only for specific public purposes, it is improper to permit a rate of return which will accrue to the private profit of the stockholders. There is nothing in the record, however, which in any manner indicates that the company is not making the service available to the widest practicable number of rural users in accordance with REA objectives, and from the rate of return approved it appears that the commission took into account the fact that the company had obtained funds on the loan at 2% interest. Moreover, it appears from the record that the company sought no allowance for going concern value, asked for nothing for meeting the expenses of unitization of its plant in accordance with a commission general order, sought no allowance for expense in this rate case, and took no allowance for extraordinary expense of storm damage and amortization. These omissions were beneficial to the consumers and, together with the net rates the subscribers now enjoy, cause us to conclude appellants have shown no basis for finding a rate of return of 4.04% to be excessive.

## Depreciation and Executive Salaries

It is recognized that in fixing utility rates, the commission must make provision for operating expenses, depreciation, and reserves which are necessary in good busi-

ness judgment, (*Illinois Bell Telephone Co. v. Commerce Com.* 414 Ill. 275, 286,) and the experience and expert knowledge of the commission and experts who testify before it are important elements in this determination. *City of Alton v. Commerce Com.* 19 Ill.2d 76, 93.

A contention is made by appellants that the order of the commission did not take into consideration the possible value of the plant retired. It is also sought to relate the depreciation period to the term of the REA loan and a contention is made that if the property were depreciated over such 35-year period, the result would be a composite rate of 2.86% instead of 3.6% allowed by the commission. In the finding of the commission, it is pointed out that the evidence shows that the company computes its depreciation in varying rates on the several classes of telephone plant contained in its service account, and that the annual composite rate resulting therefrom amounted to approximately 3.6% on the depreciable assets of the company. Reference is made in the order of the commission to General Order 167, promulgated by the Illinois Commerce Commission, which states in effect that depreciable charges of a telephone utility shall be computed by applying percentage rates considered applicable to the original cost of each class of depreciable telephone plant. These percentage rates are to be based on the estimated service value and estimated service lives developed by the company's history and experience and such engineering and other information as may be available. In defining "service value," it is pointed out that this means the difference between the original cost and (1) the salvage value for station apparatus, and (2) the net salvage for other telephone plant. The commission then concluded that the company's annual composite rate of 3.6% in its depreciable assets is reasonable for rate-making purposes. The commission had the right to consider the provisions of its General Order 167 even though it was not formally introduced in evidence. It was not a special order applicable in

any particular case or to any particular utility, and such orders are presumed to be known and all parties have equal access and knowledge of them. The company followed this practice, and evidence supports the conclusion that expected salvage value was considered. (*Lindheimer* v. *Illinois Bell Telephone Co.* 292 U.S. 151, 166-7, 78 L.ed. 1182.) Under the record, it is clear that the possibility of salvage was not completely ignored, but that, based upon experience, it was considered to be a very minor factor in operations of the character before us.

Similarly, we find no basis for equating the depreciation with the term of the REA loan. (REA Bulletin 463-1). There is no basis for such conclusion nor is there anything in the arrangement for financing which requires the depreciation period to follow such term of years. As a matter of fact, the REA requires 18% of the annual income to be used for maintenance, and either to be spent on the plant or put in the cash reserve account. Actual maintenance expense under the record allowed by the commission in fixing the rate was $66,683, which is approximately $10,000 less than the REA requirement. Under the mortgage, the company is required to reserve that amount or difference and this, potentially, further reduces the net return available to the shareholders.

The record shows that the three officers of the company are paid combined salaries of $62,400 a year, and that the company is serving over 5,000 telephones. The president is an attorney with almost 30 years experience in public utility matters and 25 years experience in public utility operations. The vice-president has approximately 50 years experience in public utility management, construction and operation. The secretary-treasurer has more than 30 years experience in public utility operation and management. The officers themselves perform all managerial and supervisory duties, and there is no other managerial personnel. There is no engineer, auditor, general manager or personnel super-

visor or other similar supervisory employees, but only maintenance help, clerks and repairmen. In effect, the three officers operate and manage the business, and even all the legal services required by the company in connection with the operation are supplied by the president without extra charge. While it is true that the salaries requested represent an increase over those of former years, the company is practically a new plant developed almost entirely between the years 1952 and 1958. The company did not seek increased rates until practically all of its exchanges were converted to dial operation. Without an increase in rates, the salaries of the officers necessarily remained relatively low, despite the increase in the scope and complexity of their duties brought about by the company's expansion and efforts to provide modern and efficient service to its subscribers. The conclusion of the commission that the record in the case does not show that total operating expenses, including these officers' salaries, are unreasonable or excessive was proper, and will not be disturbed.

### Inclusion of Ludlow and Seymour Exchanges in Property Account

Appellants contend also that since no increase in rates was sought for services rendered to the 295 subscribers on the Ludlow and Seymour exchanges, which remained in manual operation and were not converted to the automatic dial system, the effect of the increase in rates on the other exchanges already converted to dial operation compels the subscribers served by the dial systems to contribute to the expense of the Ludlow and Seymour exchanges. There was evidence in the record to the effect that income and expenses of the Ludlow and Seymour exchanges would not affect the figures presented in any appreciable manner and that income and expenses from such exchanges are substantially equal and cancel out.

In connection with the Ludlow and Seymour exchanges,

it is true that the subscribers on these exchanges would be receiving service at the old rate. The mere fact, however, that such subscribers on the two exchanges not converted to the dial system are to be charged at the old rates and all others are to be on an increased rate does not render the action of the commission discriminatory. A mere difference in rates alone does not constitute undue discrimination. (*Illinois Central Railroad Co. v. Commerce Com.* 359 Ill. 563, 568.) The Ludlow and Seymour exchanges are integral parts of one system with the same central office and the same management and supervision. It would be unjust to attempt to fix rates by eliminating expenses which are incurred in rendering a service which, though of a slightly different character, produces a part of the overall expense of the entire system. If we were to follow appellant's contentions logically, the cost of plant and income and expenses would be allocated to each exchange, and the conceivable result would be a different rate for each of the company's exchanges. Certainly the company would not have entirely eliminated the property, income and expenses of these two exchanges in seeking an increase in rates. All property, income and expense of the company must be included, and to omit the Ludlow and Seymour exchanges would not properly reflect either the fair value of the property or complete income and expense. On the record, the Ludlow and Seymour exchanges were properly included, and the rate variation was justified.

Upon a review of the entire record, it is our conclusion that the rates approved by the commission provided a fair, just and reasonable return on the fair value of the company's property used and useful in the public service. Accordingly, the judgment of the circuit court of Iroquois County is affirmed.

*Judgment affirmed.*