## COMMUNITY UTILITIES CORPORATION v. METROPOLITAN DADE COUNTY WATER AND SEWER BOARD.

No. 64-L-2781.

Circuit Court, Dade County.

May 23, 1966.

Kenneth M. Myers, Miami for the petitioner.

Thomas C. Britton, County Attorney, and Linton R. Lovett, Assistant County Attorney, for the respondent.

JAMES LAWRENCE KING, Circuit Judge.

Community Utilities Corporation instituted this proceeding to review an order of the Metropolitan Dade County Water and Sewer Board entered April 29, 1964. The cause was subsequently transferred to the undersigned judge on February 22, 1965, after the death of the Honorable Pat Cannon. A final hearing was held April 7, 1966.

Community Utilities Corporation is a water and sewer public utility company engaged in the rendering of water and sewer services to consumers in Dade County. On May 2, 1963 the Metropolitan Dade County Water and Sewer Board, *on its own motion,* initiated a rate review proceeding against the utility by the issuance of an order to show cause why the water and sewer rates of the company should not be reduced. The hearings continued over a period of time, being finally concluded on January 8, 1964. The board, on April 29, 1964, ordered a reduction in rates resulting in a decrease of $23,000 in the utility's gross annual revenue.

The utility's petition for rehearing was denied and these certiorari proceedings were commenced.

The petitioner asserts ten grounds for reversal of the board's order including denial of procedural due process, denial of substantive due process and certain constitutional questions relating to the power of the board to act. In view of the court's ruling herein in favor of petitioner on other grounds, it is unnecessary to rule upon constitutional issues.

The record reflects that the rate proceedings below were initiated by the respondent itself through issuance of a rule to show cause "why its rates should not be reduced." The petitioner appeared on the date set for the rate hearing and announced that it was prepared to introduce evidence to rebut any initial showing made by the board as to the unreasonableness of the petitioner's established rates. No evidence, however, was initially introduced by the board; rather, the board adopted a procedure wherein it required the petitioner to come forward with the evidence in the first in-

stance. The respondent board, as the initiator of these rate proceedings was the complainant, and as the complainant it should have carried the initial burden of proof to establish the unreasonableness of the rates. See In re Coal Rates, New Mexico, 1918 D PUR 182; Welch, Conduct of the Utility Rate Case, 1955, p. 203.

There is no presumption that the existing rates of a public utility company are unreasonable; to the contrary, there is a presumption of reasonableness. Morris v. New Jersey Bell Teleph. Co., 6 PUR NS 258; In Re Coal Rates, New Mexico 171 Pac. 506; 1918 D PUR 182. At the time of the hearing below the respondent board was not authorized by rule or regulation to require the utility to initially carry the burden of proof and the adoption of this procedure was a departure from essential requirements of law.

Petitioner utility contends there was no competent substantial evidence in the record to support the board's finding limiting the executive salary expense allowance to $10,000. The court agrees with this contention.

The record shows that Samuel T. Sapiro is the president and sole executive manager of the petitioner. He has been engaged in the utility business since 1954 when the company was founded and devotes full time to the business of running the company. His duties include not only the management of the day to day detailed affairs of the company, but responsibility for all fiscal matters, long range planning, and overall policy decisions. In short, Mr. Sapiro is completely responsible for the total operation of the company in all its aspects. Since 1954, the company has grown to the point where it is now serving approximately 5,000 customers, and is considered one of the largest water and sewer companies in Dade County.

Mr. Sapiro received no salary whatever from the company from its inception in 1954 until January, 1963. Commencing January 1, 1963, by approval of the board of directors, he began to draw an annual salary of $25,000. Extensive testimony was introduced by petitioner to show that, under the circumstances, the allowance of an executive salary of $25,000 to Mr. Sapiro was reasonable and entirely justified. The board offered no testimony on the reasonableness of the salary allowance, except a statement by one member of its staff to the effect that an executive employee of another utility company in Dade County earns $14,000 a year, and that since the other utility company has a large number of customers, Mr. Sapiro's salary should be reduced proportionately. There was no evidence in the record describing the duties of the other executive or comparing them with the duties performed by Mr. Sapiro.

154

Public utility regulatory law requires a regulatory commission, in ruling upon the reasonableness of an executive salary allowance, to base its ruling on evidence establishing the individual duties and activities of the particular executive in question, the complexity of duties performed, and the relative proportion that the salary paid bears to total revenues. See Re Siren Teleph. Co., 30 PUR 3d 336 (Wis. 1959); Re Ripley Water Supply Co., 74 PUR NS 446; Re Schooley v. Dallas Water Co., Penn. Comm., Docket 14473, January 29, 1951; Village of Milford v. Ill. Commerce Comm., 20 Ill. 2d 556, 37 PUR 3d 54, 170 NE 2d 576; Re Valley Water Co., 79 PUR NS 88 (Mont. 1949). If any comparisons with the salaries paid by other utility companies are to be made, the comparisons must at least be based on a showing of similar duties, activities, and responsibilities in the person receiving the other salary.

The board disregarded the petitioner's testimony and the board staff's recommendation of a $13,000 salary, and ordered an allowance of $10,000, based upon the rationale that — (1) Mr. Sapiro and his family were the sole owners of the utility, and (2) he did not draw any salary during any year prior to 1963. Neither of these reasons has any validity in law. The owner of a utility who devotes his time and energies to performing services for the company is entitled to receive a reasonable wage for such services. He is not required to donate his time to the patrons of the company. *Re East Side Telephone Co.*, 77 PUR NS 87 (Mont. 1948). Where there is a lack of evidence that the services claimed to be performed are not performed by the officer in question, or that the amounts paid are excessive in relation to the company's scope of operations or its total revenues, the utility's designated expenses for the executive officer should be allowed, notwithstanding the fact that no salaries were paid in prior years. See *Reese v. Shavertown Water Co.*, 89 PUR NS 553 (1951).

There was absolutely no competent evidence in the record before the board to indicate that the salary allowance designated by petitioner's management was unreasonable when viewed in relation to the company's total operations or its total revenues, and when examined in the light of the individual activities of Mr. Sapiro. In the absence of such evidence, the board cannot substitute its judgment for that of management.

The court does not question the right of a regulatory commission to determine the reasonableness of executive salaries as an item of expense for rate-fixing purposes; but any determination in this regard must be based upon competent substantial evidence. Here no such evidence existed except that offered by petitioner. It is

clear, then, that the finding of the board on this point is arbitrary and constituted a substantial departure from essential requirements of law.

As noted by the Supreme Court of the United States in Southwestern Bell Telephone Co. v. Public Service Commission of Missouri, 262 U.S. 276, 289 (1923) —

> "The commission is not the financial manager of the corporation and it is not empowered to substitute its judgment for that of the directors of the corporation; nor can it ignore items charged by the utility as operating expenses unless there is an abuse of discretion in that regard by the corporate officers."

We now come to the key issue in this case — whether the determination by the board in its order limiting the utility to a 6% rate of return was supported by any competent substantial evidence. This court thinks not and finds, after a thorough review of the record, that such determination was arbitrary.

The petitioner introduced extensive evidence on the question of rate of return. Exhibits were offered setting forth the capital structure of the company, showing that total capital was $1,243,560, consisting of $510,000 in long term mortgage debt (or approximately 41% of total capital), $147,000 in unsecured debts (or approximately 36% of the total), preferred stock of $122,000 (9.81%), common stock of $120,000 (9.65%), and earned surplus of $44,560 (3.58%). The utility's computed composite cost of money, based on these undisputed figures, was then shown through an expert witness who testified that using 10% as the cost of equity capital, the minimum rate of return required is 6.61%. If the cost of equity capital is computed at 12% a minimum rate of return of 6.88% would be required.

Petitioner's witnesses also testified as to the return on common stock required in order to attract investors in the light of the capital structure of the company, the returns available to competing and comparable investments, and the special circumstances of this utility. This testimony concluded that a return on common equity of 10% to 12% is required by the utility, and an overall rate of return of between 6.61% and 6.88% on the company's rate base is the minimum necessary in order for the company to pay its operating expenses, interest on borrowed capital, a reasonable return on its common stock and to accumulate a reasonable surplus so that it may maintain its credit, attract needed capital and compensate over a period of years for such things as risk and inflationary factors. These factors are well established as the basis for determin-

ing a minimum reasonable rate of return required by a public utility. See, e.g., Re Plainfield Union Water Co., 154 A 2d 201 (N. J. 1959); Re Indiana Bell Tel. Co., 72 PUR NS 191, 215 (1947); Re Western Carolina Teleph. Co., 53 PUR 3d 117 (1964); Re Fla. Power Corp., 99 PUR NS 129 (1953); Peoples Water & Gas Co. v. City of Miami Beach, 90 PUR NS 401 (Fla. 1951); Nichols, Ruling Principals of Utility Regulation, 1955, pages 199, 66-67.

The board presented no competent evidence whatever on the question of rate of return. The final order stated that it had decided that a 6% return "is ample for this utility" and based its decision on "the familiarity the board has developed from its review of the financial affairs and practices of the other thirty private utilities operating in Dade County."

The board's opinion as to what is a proper rate of return is not a valid substitute for evidence. See Public Service Commission v. Ely Light and Power Co., 393 P 2d 305 (Nov. 1964); Washington Gas Light Company v. Public Utilities Comm. of District of Columbia, 55 F. Supp. 627; Re Plainfield-Union Water Co., supra.

In the Washington Gas Light Co. case, supra, the United States District Court had before it a situation similar to that before this court. There the court was considering an order of the District of Columbia Public Utilities Commission which had made a determination that a reasonable allowance for the utility's cost of common stock equity was 9%. During the rate proceedings the utility's witness testified that 10.98% was a reasonable cost of equity, and other testimony from the commission's witnesses indicated that a 11.68% return would be reasonable. The commission, however, disregarded the testimony of all of the expert witnesses and substituted the figure of 9% instead. The court in setting aside the order stated in part —

"Taking as necessary that rates to be valid, not only under that act, but generally, must 'enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed,' there was no substantial evidence before the commission to support its findings. *A mere general opinion of the commission, unsupported by findings of fact based on substantial evidence, is of no effect.*

The question before the commission was what constitutes a reasonable allowance based on the cost of the common stock capital. By cost of capital is meant interest charges and enough more to attract capital to the company, and to maintain its

credit. Both the commission and the company's witnesses used earning-price ratios as the principal method of ascertaining the investors' appraisal of the return required on the common stock capital. The commission's witness found that the investors' appraisal of the return required on the common stock capital of the company was 11.68 percent and the company's witnesses fixed it at 10.98 percent, both exclusive of the cost of financing. The earnings-price ratio of the six gas companies to which the commission's witness testified was 10.54 percent. *In its findings the commission adopted neither of these facts as the cost of common stock capital, it substituted 9 percent as a reasonable allowance* and amended the sliding-scale order of 1935 so as to reduce the primary rate of return from 6½percent to 5¾ percent.

This allowance of 9 percent is not supported by any substantial evidence and is arbitrary, unreasonable, and void.

The order of the commission should be set aside." (Italics added.)

There being no competent substantial evidence in the record here involved to support the board's decision on rate of return, it is clear that the board failed to comply with the essential requirements of law, and the respondent's decision on this point is arbitrary and void.

It is not necessary to a determination of the issues raised herein for the Court to concern itself with questions pertaining to the rate base. One of the points raised by the petitioner dealt with the question of the working capital allowance and the utilization by the board of a "negative working capital", that is, a deduction of what the board found to be "excess customers' deposits" over and above what the board determined to be a reasonable working capital allowance. Although petitioner's contention regarding the lack of evidence in the record to support the board's decision on this point may have some validity, the court does not rule upon this question since it is not necessary to this decision.

For the reasons above expressed, the court is of the opinion that the order to show cause which originally initiated these proceedings on May 2, 1963, should have been discharged. The writ of certiorari be and it is hereby granted and the writ is issued as prayed. The order of the board entered on April 29, 1964, is quashed, with directions to the respondent to discharge the order to show cause.