UNION ELECTRIC COMPANY, Petitioner-Appellee, *v.* ILLINOIS COMMERCE COMMISSION, Respondent-Appellant.—(CERRO COPPER PRODUCTS *et al.*, Intervenors-Appellants.)

Fourth District No. 14793

Opinion filed October 12, 1978.

TRAPP, J., dissenting.

William J. Scott, Attorney General, of Springfield (Hercules Bolos, Assistant Attorney General, of counsel), for appellant Illinois Commerce Commission.

Randall Robertson, of Leuders, Robertson & Konzen, of Granite City, and John P. Meyer, of Danville, for appellants Cerro Copper Products *et al.*

William E. Jaudes, of Union Electric Company, of St. Louis, Missouri, and Robert Broderick, of Pope & Driemeyer, of Belleville, for appellee.

Mr. JUSTICE CRAVEN delivered the opinion of the court:

The Illinois Commerce Commission (Commission) and certain industrial intervenors timely appeal the trial court's decision remanding the cause to the Commission for reconsideration based on the court's finding that the Commission acted outside the scope of its authority in both determining "value" for rate purposes and setting a rate of return primarily based on a decision of the Missouri Public Service Commission. Due to the substantial issues involved, the facts in the record will be detailed in some length.

On February 11, 1975, Union Electric (UE) filed a tariff with the Commission seeking a general rate increase. Numerous hearings were held between April 11, 1975, and December 16, 1975, when the case was submitted to the Commission after oral argument. On January 9, 1976, the Commission filed its order determining the adjusted original cost rate base for UE's property allocated to Illinois operations to be $197,173,000. The Commission also found a return of approximately 7.83% applied to the rate base (yielding operating income of some $15,429,000) to be fair, just, and reasonable. UE's application for rehearing was denied by the Commission on February 18, 1976.

Union Electric, a Missouri corporation, generates and sells electric energy in Missouri, Iowa, and Illinois. It serves three areas in Illinois,

including an area near Keokuk, Iowa, and the cities of East St. Louis and Alton. The Illinois service area has a population of about 262,000, while UE's Missouri and Iowa service areas have estimated populations of 1,943,000 and 47,000, respectively. The bulk of the company's 739,000 electric customers are in Missouri; there are 70,000 Illinois customers, and 16,000 in Iowa.

During the hearings, UE tendered evidence of two proposed rate bases. Exhibit C contained an estimate based on a net "original cost" approach; $204,297,000 was the value given to the company's property attributable to Illinois operations. W. E. Cornelius, executive vice president, testified that the company sought a 9% return on a rate base determined on net original cost. An alternative reproduction cost valuation of UE's property attributable to Illinois operations of $403,082,000 was tendered through exhibit D. This latter figure, based on a "current value" concept, was composed of a "modern substitute plant method" of estimating plant value, a "trended" original cost approach to some nonplant capital items, and the use of original cost for items such as land. UE did not contend that the "current value" rate base be adopted by the Commission *en toto*. Pertinent parts of Cornelius' testimony follows:

"Q. Has an estimate been made of the fair value of Union Electric's electric properties used to serve customers located in Illinois?

A. Yes. The fair value of these properties at December 31, 1975, is $263,933,000. This figure was arrived at by weighting the $204,297,000 net original cost rate base at 70% and the $403,082,000 current value rate base at 30%. The percentage weightings used are based on our capitalization ratios at December 31, 1975, of 70% fixed dollar capital (bonds and preferred stock) and 30% common equity. The development of the components of fair value, that is, the net original cost and current value rate bases will be covered by subsequent witnesses.

Q. Why did you use your capital ratios in determining a fair value rate base?

A. Since approximately 70% of the funds to finance our properties have come from fixed dollar securities, this percentage of the rate base should be based on original cost. The balance of our funds comes from common equity or risk capital which shares in the gains or losses resulting from changes in price levels. Accordingly, the rate base financed by this type of capital should be based on present price levels."

If the Commission did use the proffered "fair value" estimate based on the 70/30 averaging, Cornelius asked for a 7% rate of return. The witness stated the revenues thus received would approximate a 9% return on the

lower net original cost figure. On cross-examination, Cornelius admitted UE was highly leveraged. Due to certain Commission rulings concerning test year data, UE introduced exhibit H, which included a net original cost estimate of $199,085,000, a decrease of over 5 million dollars from its earlier estimate. The Commission adopted a test year ending June 30, 1975, and, after adjustments, determined the value of UE's property attributable to Illinois operations to be the aforementioned $197,173,000. The Commission rejected UE's "current value" evidence and refused to weigh that reproduction cost estimate in its decision on rate base value. The Commission reaffirmed its March 13, 1973, order in the Central Illinois Public Service Co. case (Commission Docket No. 57300 (1973)) that the original cost method of valuation best accomplished the Commission's obligation in fixing rates as low as possible for the consuming public, but, at a sufficient level to provide operating expenses, proper reserves, and a fair and reasonable return to the utility's investor.

In determining the rate of return on the rate base, the Commission admitted a late-filed exhibit (Staff exhibit Z). The exhibit was the Missouri Public Service Commission's order of December 22, 1975, determining UE's Missouri rates. The Commission decided to adopt once again its position stated in an earlier Union Electric decision (Docket No. 57469, April 13, 1973), and noted that while the record contained evidence which could warrant approval of rates by the Illinois Commission which would be higher than those approved in Missouri, UE's Illinois service area is a minor part of the Company's integrated bistate system. After reciting section 38 of the Public Utilities Act (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 38), the Commission stated it was "unwilling" to require Illinois consumers to pay a higher rate than the other 90% of UE's consumers for identical service. It noted that a small minority of Illinois customers should not be put in a position of subsidizing a vast majority of out-of-State consumers. While perceiving the problem to be primarily due to the absence of multistate regulatory schemes, the Commission felt the "necessity" to recognize the Missouri rate structure. The Commission found the peculiar circumstances of the utility's operation in Missouri and Illinois, however, rendered "traditional" rate-making procedures impossible without imposing an unnecessary burden on the Illinois consumer. The Commission, thereafter, adopted rates, for practical purposes, identical to those approved earlier by the Missouri Public Service Commission.

On March 8, 1976, Union Electric timely appealed the denial of the Commission's rehearing application to the circuit court of Jersey County. The industrial intervenors also appeared in circuit court. After thorough briefing and oral argument, the trial court filed its memorandum of opinion on November 17, 1977. The court first adopted the factual

findings of the Commission in its order. Then, the court commented upon the Commission's use of the net original cost rate base method in determining value. As the trial court understood Illinois law, "original cost is but one of many factors that should be considered by the Commerce Commission" in arriving at a figure of "value" for rate purposes. The court then stated it appeared the Commission "abandoned" the "present value" concept of rate-making and substituted in lieu thereof the "original cost" theory. This, the court determined, was contrary to law. While it was conceded that evidence on the question of present value had been admitted, the court found it clear that the Commission completely ignored such evidence in arriving at its order.

Turning to UE's objections to the Commission's finding of a rate of return exactly the same as that of the Missouri Public Service Commission, the court stated the Commission did not err in receiving the Missouri Commission's order into evidence but, rather, the Commission did err in the weight given to that order. Relying on language that the Commission was "unwilling" to require higher rates for the Illinois customers of UE and that the Commission would not use normal rate-making procedures due to the particular circumstances of UE's bistate operation, the court found that the Commission had forsaken the "traditional rate-making procedures" as laid down by the Illinois Supreme Court, and had relied so heavily on the Missouri Commission's order that it substituted the judgment of the Missouri Commission in lieu of its own authority. The court further found the Public Utilities Act had no extraterritorial effect. While the trial court was in sympathy with the Commission's plight as a result of UE's operation in more than one State, the court reasoned that Illinois law must still be upheld. The cause was remanded to the Commission to reconsider its order. The Commission timely appealed on December 13, 1977; the intervenors followed suit two days later.

Two issues are presented for review. The first is whether or not the trial court was correct in finding the Commission had acted outside the scope of its authority in basing a finding of value on net original cost and excluding evidence of reproduction costs from any weight in its opinion. The second issue is whether or not the trial court was correct in finding the Commission abandoned its statutory rate-making authority in setting rates for UE's Illinois customers based on the Missouri Public Service Commission's rate of return findings. Also pending before this court is *Illinois Bell Telephone Co. v. Illinois Commerce Com.* (1978), 64 Ill. App. 3d 645, 381 N.E.2d 999, filed simultaneously with this opinion, wherein the same issue of the Commission's use of net original cost to determine value for rate-making purposes is before this court. Therefore, the arguments and supporting authorities brought to the court's attention by the litigants

in the *Illinois Bell* case are noted as this court determines the issue in the instant case.

To better understand the ramifications of the Commission weighing in a "current value" figure to determine "value" in the instant case, one need only consult the record. The value of UE's Illinois property was found by the Commission to be $197,173,000. The proposed "fair value" figure (including a 30% weighing of the "current value" figure of $403,082,000) is $263,933,000. The difference of $66,760,000 is the amount UE argues should be included in the rate base. If the $66,760,000 were added to the rate base approved by the Commission, the resultant revenue increase at a 7.83% rate of return would be $5,227,308.

The Commission and industrial intervenors argue that the court should give great deference to the decisions of the Commission in ascertaining "value" for rate-making purposes and that the Commission is entitled to give "zero" weight to evidence of reproduction cost in determining value. This court is urged to look at the result and not the methodology of how the final figure came to be. Section 68 of the Public Utilities Act (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 72) is cited as authority that this court cannot inquire into the method by which the Commission reaches its determination of value. The Commission and intervenors further argue that the use of reproduction cost is not constitutionally required in the determination of a rate base, that the language of the statute does not require the Commission to use current reproduction costs, and the case law construing the statute does not compel reversal.

The Commission contends evidence of reproduction cost is, at best, hypothetical, whereas original cost of equipment can be easily determined from the Company's books and records. The Commission states use of reproduction cost provides a "windfall" value figure during an inflationary period, results in the utility being granted a return on an investment which it did not make, and raises the utility's operating costs since the extremely expensive reproduction estimates are classified as a proper expense.

UE and Bell argue the Commission's use and finding of value based, in part, upon evidence of reproduction cost is compelled from (1) supreme court authority construing parts of the Public Utilities Act, and (2) the fact that the legislature has not seen fit to amend those sections after the supreme court construction. According to UE and Bell, reproduction cost must be given some weight by the Commission in its figuring of value as a matter of law. Although conceding that use of present value in figuring a rate base is not constitutionally required, the utilities argue the higher rate base arrived at through use of reproduction cost is needed to attract capital, to protect the utility and its shareholders against inflation, and that the Commission must use the higher standard of value since the

Commission would not make up for the lower rate base through higher rate of return allowances. Illinois Bell in particular feels that raising this issue is like "kicking a dead horse," since the matter, according to Bell, has been put to rest by the supreme court.

Certain parts of the Public Utilities Act (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 1 *et seq.*) are relevant to the issue herein raised. They are as follows:

"The Commission shall have power to ascertain the value of the property of every public utility in this State and every fact which in its judgment may or does have any bearing on such value. * * * [T]he burden of establishing such value shall be upon such public utility or utilities." Ill. Rev. Stat. 1977, ch. 111 2/3, par. 30.

"All rates or other charges made, * * * shall be just and reasonable. Every unjust or unreasonable charge made, * * * is hereby prohibited and declared unlawful." (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 32.)

"On such hearing, the Commission shall establish the rates or other charges, * * * which it shall find to be just and reasonable." Ill. Rev. Stat. 1977, ch. 111 2/3, par. 36.

"Whenever the Commission, * * * shall find that the rates or other charges, * * * collected by any public utility * * * are unjust, unreasonable, discriminatory or preferential, or in any wise in violation of any provisions of law, or that such rate or other charges or classifications are insufficient, the Commission shall determine the just, reasonable or sufficient rates * * * and shall fix the same by order as hereinafter provided." (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 41.)

"[On appeal,] [t]he findings and conclusions of the Commission on questions of fact shall be held prima facie to be true and as found by the Commission; and a rule, regulation, order or decision of the Commission shall not be set aside unless it clearly appears that the finding of the Commission was against the manifest weight of the evidence presented to or before the Commission for and against such * * * decision, or that the same was without the jurisdiction of the Commission. * * * [O]rders * * * of the Commission shall be held to be prima facie reasonable, and the burden of proof upon all issues raised by the appeal shall be upon the person or corporation appealing from such * * * [order]." Ill. Rev. Stat. 1977, ch. 111 2/3, par. 72.

As can be easily ascertained from the above-quoted statutory provisions, the Commission is to determine just and reasonable rates of return based on the "value" of the company's property used and useful in Illinois. The concept of "fair value" became entrenched in Illinois law with the case of *State Public Utilities Com. v. Springfield Gas & Electric*

*Co.* (1919), 291 Ill. 209, 125 N.E. 891. In that case, the Illinois Supreme Court borrowed from the earlier United States Supreme Court case of *Smyth v. Ames* (1898), 169 U.S. 466, 42 L. Ed. 819, 18 S. Ct. 418, in laying its judicial *imprimatur* upon the statutory predecessor to the current Public Utilities Act. In *Smyth*, Mr. Justice Harlan indicated that factors in determining the fair value of a utility's property included original cost, permanent improvements, the market value of its bonds, the present cost of constructing the facilities, the probable earning capacity of the property, and the necessary sum to meet operating expenses. Justice Harlan felt all were matters for consideration and were to be given such weight as may be just and right in each case. Justice Thompson reiterated those sentiments in the *Springfield Gas & Electric Co.* case and continued, stating:

> "Therefore it cannot be laid down as a rule without qualifications that cost of reproduction new, less depreciation, is the only basis of valuation for rate-making purposes. It is equally true that the original cost of construction, less depreciation, cannot be held to be the only proper basis for determination of valuation for rate-making purposes. As we have pointed out heretofore in this opinion, the weight of authority is that every element having any bearing on the situation must be considered in the investigation and then sound business judgment applied to the determination of a valuation that is fair and just to the consumer and the utility. Each case must be considered on its own merits and such result of value arrived at as may be just and right in each case. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts. We consider any value a fair value which fair and reasonable men would say ought to be attached to the property, under all the circumstances of the particular case, for the purpose of measuring a return which the public should pay the owner." (291 Ill. 209, 222, 125 N.E. 891, 897.)

*Springfield Gas & Electric Co.* also firmly established the laudatory proposition that the review of rate-making decisions is limited to determining whether or not the administrative body acted within the scope of its authority, or whether the order is without substantial foundation in evidence, or whether a constitutional right of the utility was infringed.

■■ The economic reality of the use of reproduction cost in determining a "value" for rate-making purposes is that reproduction cost is disadvantageous to the utility in a time of recession or falling prices and is advantageous to the utility in a time of accelerating prices or inflation.

The relevant statutory language governing Commission authority has not been changed since the *Springfield Gas & Electric Co.* case. The common thread of all major Illinois cases concerning Commission rate-making is that the establishment of rates is left to the expertise and sound business judgment of the Commission, whose opinion is entitled to great deference since the establishment of rates is not a decision subject to legal formula or exact determination (*Springfield Gas & Electric Co.*; *Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Com.* (1960), 19 Ill. 2d 436, 167 N.E.2d 414; *Village of Apple River v. Illinois Commerce Com.* (1960), 18 Ill. 2d 518, 165 N.E.2d 329; *Villages of Milford v. Illinois Commerce Com.* (1960), 20 Ill. 2d 556, 170 N.E.2d 576; *Illinois Bell Telephone Co. v. Illinois Commerce Com.* (1973), 55 Ill. 2d 461, 303, N.E.2d 364). However, this court, like any Illinois court, will not abrogate its duty to determine if the Commission, in making its determination, acted outside the scope of its authority through the use of erroneous methodology.

The Commission, in the 1973 Central Illinois Public Service Co. case (Commission Docket No. 57300 (1973)) practically pleaded with the judiciary to recognize what the Commission found to be an unworkable rate formula, *i.e.*, the use of replacement cost as an element of "value." The Commission wrote that the use of reproduction cost studies in determining value were, for the most part, inconclusive. Such a cost study posed a dilemma in its hypothetical assumptions, such as the amount to be offset for advances in technology, and the amount of depreciation to give to a hypothetically reproduced plant; the end result of all this was an estimate of a hypothesis (reproduction cost new), reduced by another estimate (observed depreciation), to arrive at a mathematical uncertainty (reproduction cost new, less depreciation) "which defies documentary verification" or, we might add, effective cross-examination. The Commission also complained of the uncertainties in weighing reproduction cost with original cost studies. In addition, the time-consuming and costly reproduction cost studies were reflected in a higher operating base of the Company and, therefore, the estimates themselves were an additional financial burden on the consumer. For example, in his 1950 book, Clemens reports that the appraisal of the Chicago telephone properties in a proceeding cost $1,200,000. The Commission concluded:

> "The very scale of these hypothetical and conjectural presentations has precluded effective challenge by intervenors. The net effect of this burden is to place in jeopardy the Commission's ability to serve the public adequately, since the resultant estimated rate base presented defies documentary verification. The millions, if not billions, of dollars that are involved in major rate cases makes it mandatory, in the public interest, to eliminate, as much as possible,

these uncertainties in the rate-making process. In the Commission's judgment, the 'original cost' method best accomplishes the basic obligation of the Commission * * *."

The rule favoring use of replacement cost as an element of value is based on the times of *Smyth v. Ames* (1898), 169 U.S. 466, 42 L. Ed. 819, 18 S. Ct. 418, and has been abrogated in the Federal system and a majority of the States. The industrial intervenors inform this court that the following jurisdictions embrace the "original cost" concept of value: Alaska, Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Mississippi, Nevada, New Hampshire, North Dakota, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

Rate-making predicated upon replacement cost is not constitutionally mandated (see, for example, *Federal Power Com. v. Hope Natural Gas Co.* (1944), 320 U.S. 591, 88 L. Ed. 333, 64 S. Ct. 281); the argument turns on one of statutory construction. Rates predicated upon replacement cost give utilities a return on an investment which they have never made and which they never will make. The existing equipment used and useful in service would not be replaced as such due to advances in technology. In this regard, the problems of hypothetical reproduction estimates, the offsetting effect of technological progress, and the uncertain effect of the assumptions of continuing price rises, along with the problems of a windfall to the utility resulting in a profit based on inflation through a reproduction cost valuation have been the subject of academic discussion. See Clemens, Economics and Public Utilities, Appleton-Century Crafts (New York 1950); J. Rose, *Confusion in Valuation for Public Utility Rate-Making*, 47 Minn. L. Rev. 1 (1962); and E. Levin, *Illinois Public Utility Law and the Consumer: A Proposal to Redress the Imbalance*, 26 DePaul L. Rev. 259 (1977).

As noted earlier, UE did not contend that the Commission was bound to accept UE's current value figure of $403, 082,000 as the rate base; it only argued a 70/30 averaging of net original cost and current value was "fair value." And then, UE asked for a *lower* rate of return (7%) on "fair value" and admitted the revenues generated would approximate the 9% return they sought on net original cost. We find it strange that "fair value" for UE is arrived at by an averaging based on the percentage of common stock to preferred stock and bonds in a self-described highly leveraged company. The final rate base figure is but one component in rate-making. The percentage return allowed is as important as the rate base in determining

revenues, which is the important "bottom line." Thus, if the Commission chooses the lower of two rate base figures, it will, by necessity, have to tailor its rate of return upward to meet its statutory obligation of providing "just, reasonable or sufficient rates" to the regulated industry.

In construing the Public Utilities Act, as with any other statute, this court is bound by the construction adopted by the Illinois Supreme Court. The most definitive review of the concept of "fair value" occurs in the supreme court's decision in *City of Chicago v. Illinois Commerce Com.* (1954), 4 Ill. 2d 554, 123 N.E.2d 500. In that case, the court stated that its earlier opinion involving *Illinois Bell* (414 Ill. 275, 111 N.E.2d 329) found that, as to ascertaining fair value, the error of the Commerce Commission consisted in ignoring "current economic conditions." In addition, the court, quoting from *State Public Utilities Com. v. Springfield Gas & Electric Co.* (1919), 291 Ill. 209, 125 N.E. 891, stated that in construing the statute " '[T]he Commission must use a rate base which represents the present fair value of the utility property, arrived at after full and proper consideration of reproduction cost, and a reasonable return, based upon an appraisal of the opportunities available for investment in other enterprises.' " 4 Ill. 2d 554, 558, 123 N.E.2d 500, 502.

In light of the above statements, is this court compelled to order the Commission to enter a determination of value premised only upon replacement cost? The answer is in the negative. Our supreme court stated that the Commission must give consideration to replacement cost and consideration to current economic circumstances. The "current value" evidence was admitted and considered by the Commission, as was other evidence of current economic conditions, such as allowing part of the construction work in progress cost of the Calloway Nuclear Facility to be included in the rate base, an examination of UE's capital structure, and the problems flowing from the downgrading of UE's bond rating. We also note that in our companion *Illinois Bell* case, Commission consideration of current economic conditions aside from reproduction cost is evident in its raising coin phone rates, its examination of Bell's cost of debt along with current market conditions relating to the cost of capital, and in its discussion of the effect of planned wage increases. In the instant case, the Commission correctly received evidence of replacement cost and other factors relating to current economic conditions and it properly rejected replacement cost as a factor of value in favor of a more realistic, ascertainable measure of value founded upon original cost.

If this court were to hold as UE and Bell contend, we would be imposing upon the Commission a rate-making formula that would, in effect, be judicial rate-making. The Supreme Court of Illinois has consistently held that, if acting within its authority, rate-making is for the

Commission and not for the courts; we reaffirm that wise proposition. See *Springfield Gas & Electric; Village of Apple River*; and *Iowa-Illinois Gas & Electric.*

Originally, the legislature set public utility rates; it later created a commission to develop an expertise and set rates according to the general guidelines of what is now the Public Utilities Act. The Commission should be allowed maximum flexibility within its statutory authority to set value and rates of return. It is not a hollow slogan that this court will defer to the expertise and sound business judgment of the Commission in the actual determination of value and rate of return, so long as it does not violate statutory mandate. This case, and the *Illinois Bell* case, are sterling examples of the reason for this rule of deference.

■■■■ Original cost may be easily determined from the Company's records. Use of original cost avoids misplaced reliance upon the unreliable and incredibly expensive reproduction cost "guesstimates," for which the consumer must pay. Rate-making should be as exact a science as possible, for the benefit of both the utility and the general public. The record shows the Commission received and considered evidence of current economic conditions, including replacement cost. The cases do not suggest that the Commission must pay slavish obedience to reproduction cost estimates in determining value. Reproduction cost is but one factor of current economic conditions. We hold that the Commission did not violate the supreme court mandate in its consideration of factors and that it acted within its statutory authority, as construed by the courts, in choosing the components of value for rate-base purposes. We further hold that the Commission properly considered current economic conditions, did not err in rejecting inclusion of "current value" in its rate-base decision, and correctly set a fair value rate base of $197,173,000 in the instant case.

The intervenors argue that the trial court erred in overturning the Commission's finding of a rate of return based primarily upon the rates of return allowed by the Missouri Public Service Commission. The intervenors argue that it was the Commission's duty under sections 38 and 41 of the Public Utilities Act (Ill. Rev. Stat. 1975, ch. 111 2/3, pars. 38, 41) to avoid unreasonable discrimination between Illinois and Missouri consumers and that the Commission acted properly. Union Electric argues that the trial court correctly found that the Commission had abandoned its statutory rate-making duty and that section 38 does not have extraterritorial effect. The Commission does not address this issue. In its January 9, 1976, order, the Commission stated, in part:

> "While evidence *may* be contained in the record which could warrant approval of rates by this Commission which would be in excess of those approved by this Order, Union's service area in Illinois is essentially a minor part of the Company's integrated

metropolitan bi-state area system of which the major part is located in the St. Louis, Missouri area. * * *

* * *

Under traditional rate-making procedures, this Commission would approve rates and tariffs which would yield an acceptable rate of return on the value of the utilities [sic] property used and useful in serving Illinois rate payers. The peculiar circumstances of this utility's operations in Illinois and Missouri, however, render such consideration impossible in this instance without imposing unjust and unreasonable discriminatory rates on Illinois rate payers.

* * *

The Commission is of the opinion that the rates allowed to become effective by virtue of this Order, should appreciably enable the Company to improve its financial standing with the investing public without imposing unjust and unreasonable discriminatory rates on Illinois rate payers." (Emphasis supplied.)

No party before this court questions the findings of the Commission that the rates previously in effect for Union Electric resulted in a rate of return of 5.75% and that those rates were not fair and reasonable. Likewise, Union Electric does not now suggest that its proposed tariff of February 11, 1975, creating a rate of return of 9.81% on the net original cost rate base was proper; it is unquestioned such a rate of return would be excessive, unjust, and unreasonable. Taking the lead from the Missouri Public Service Commission, the Commission approved a rate of 7.83%.

Section 38 of the Public Utilities Act does not have extraterritorial effect. However, the Commission's partial reliance upon section 38 in its rate of return decision is not determinative. In fact, the record adequately shows that the Commission did not abandon its statutory duty under section 41 to set "just, reasonable, or sufficient rates." The preexisting rate of 5.75% was too low and 9.81% is too high. As the trial court correctly noted, the Illinois Commerce Commission can take administrative notice and properly admit as evidence the final order of the Missouri Public Service Commission. If the Commission determines that the Missouri rates produce a just or reasonable rate of return, the Commission may be guided by those rates. The circumstances of the instant case are most unusual. Union Electric's electrical distribution system is an efficient integrated network. The rate base for Illinois is figured on an allocation of UE's total property, rather than property physically situated in Illinois. It is not unreasonable for the Illinois Commerce Commission to be sensitive about allowing rates to be charged against Illinois rate payers in excess of the charges paid by other consumers of the same electrical network. It would be incongruous to mandate that Illinois consumers pay higher costs

per kilowatt for the same service. Based on the whole record, we cannot say that the rate of return set by the Commission was unreasonable as a matter of law. This decision does not conflict with *Union Electric Co. v. Illinois Commerce Com.* (1977), 48 Ill. App. 3d 967, 363 N.E.2d 424. In the earlier *Union Electric* case, this court found the case to be moot and reversed and remanded to the trial court with directions to dismiss the appeal. Under well-established rules of law, this court's comments not directly connected with its holding were *dicta*. In fact, this court agrees with the *dicta* of *Union Electric* that section 38 of the Public Utilities Act does not have extraterritorial effect. Therefore, *Union Electric* does not require a different result herein.

■■■ In summation, the supreme court's construction of pertinent sections of the Public Utilities Act commands that the Commerce Commission receive evidence on current economic conditions, including reproduction cost, of the utility's property but does not command the weight the Commission must give to that evidence in determining "fair value." The Commission's determination of value based on net original cost was within its statutory authority and the final figure was not contrary to the manifest weight of the evidence. Regarding the determination of rate of return, the Commission may take note of other States' determinations of value and rate of return regarding regulated utilities also operating in that jurisdiction and use such rate of return as a factor in its fixing of a just and reasonable rate of return. The Commission's determination of a 7.83% rate of return in the instant case was within the statutory authority of the Commission and not against the manifest weight of the evidence. The judgment of the circuit court is reversed and the cause is remanded with directions to enter an order affirming the Commission's decision.

Reversed and remanded with directions.

REARDON, J., concurs.

Mr. JUSTICE TRAPP, dissenting:

The principal opinion construes the authorities to hold that the Commerce Commission received evidence of the current value, gave it some consideration, and "properly rejected replacement cost as a factor of value." Such conclusion is contrary to the construction of the Utilities Act adopted by the Supreme Court.

In support of that conclusion, the principal opinion quotes a part of the language found in *City of Chicago v. Illinois Commerce Com.* (1954), 4 Ill. 2d 554, 123 N.E.2d 500:

> " '[T]he Commission must use a rate base which represents the present fair value of the utility property, arrived at after full and

proper consideration of reproduction cost, and a reasonable return, based upon an appraisal of the opportunities available for investment in other enterprises.' " (4 Ill. 2d 554, 558, 123 N.E.2d 500, 502.)

The language "[m]ust use a rate base * * *" is stated in the imperative. Other language in that opinion states the rule more precisely and definitively in the court's statement that its former opinions:

"[A]dhered to the rule that the rates of this utility *must earn* a return upon the present value rather than on the original cost of its property." (Emphasis added.) 4 Ill. 2d 554, 558, 123 N.E.2d 500, 502.

In the context of construing the Utilities Act, that opinion states:

"For many years, this court has ruled that *it is the duty* of the Illinois Commerce Commission and its predecessor commissions, under the Public Utilities Act of this State, to allow a proper return upon the present fair value of utility property." (Emphasis added.) 4 Ill. 2d 554, 558, 123 N.E.2d 500, 502.

In *Illinois Bell Telephone Co. v. Illinois Commerce Com.* (1953), 414 Ill. 275, 111 N.E.2d 329, a case preceding and related to the cited *City of Chicago*, it was contended that the Commission should be permitted to base its findings, "only [on] the value of the investment, without regard to the present value of the company's property dedicated and actually used in public service." (414 Ill. 275, 287, 111 N.E.2d 329, 336.) That record disclosed that the Commission had disregarded the evidence of reproduction costs. In reversing for such error, the court stated:

"In construing the statute this court held that the Commission *must use* a rate base which represents the present fair value of the utility property, arrived at after full and proper consideration of reproduction cost, and a reasonable return, based upon an appraisal of the opportunities available for investment in other enterprises." (Emphasis added.) 414 Ill. 275, 288-89, 111 N.E.2d 329, 336.

The court noted the history of the Utilities Act and citing *Peoples Gas Light & Coke Co. v. Slattery* (1939), 373 Ill. 31, 25 N.E.2d 482, stated:

"* * * that the determination of just and reasonable rates under the Illinois statute *depends upon* the *present fair value* of a utility's property." (Emphasis added.) 414 Ill. 275, 289, 111 N.E.2d 329, 337.

In the context of reversal, the supreme court stated that the Commission erred:

"* * * in failing to take into account current economic conditions, present price levels, and reproduction costs." 414 Ill. 275, 290, 111 N.E.2d 329, 337.

In *City of Alton v. Commerce Com.* (1960), 19 Ill. 2d 76, 165 N.E.2d 513, the supreme court, in reviewing the elements and factors found in an order of the Commerce Commission, stated:

> "It is well established in Illinois that the utility is *entitled* to a reasonable overall return on the fair value of its property, not the original cost. This provides a flexible rate-making standard which is equally applicable in periods of rising and falling price levels. (See *City of Chicago v. Illinois Commerce Com.*, 4 Ill. 2d 554.)" (Emphasis added.) 19 Ill. 2d 76, 86-87, 165 N.E.2d 513, 519.

The argument in behalf of the Commission and of the intervenors apparently adopted in the principal opinion that judicial review should be limited to consideration of the fairness of the result and that if deemed reasonable the order should be affirmed without regard to the method used or the separate elements weighed in fixing the rate. This argument was expressly rejected in *City of Alton v. Commerce Com.*, where the court said:

> "The Commission objects particularly to setting aside its order because of purported errors in computing reproduction value less depreciation when the final fair value determination is not challenged as unreasonable. It argues that if the final determination is reasonable the courts should not inquire into the separate elements of value which are considered in reaching that finding. This position ignores the right of the parties and the public not just to a reasonable determination but rather to a determination which arises from sound and lawful analysis of the problems presented. Without power to review the intermediate steps in the administrative decision-making process, effective judicial review would be extremely difficult if not impossible. Neither the statute nor this court's decisions in the rate regulation field indicate that such a result is intended." (19 Ill. 2d 76, 80-81, 165 N.E.2d 513, 516.)

See also *Camelot Utilities, Inc. v. Illinois Commerce Com.* (1977), 51 Ill. App. 3d 5, 9, 365 N.E.2d 312, 315.

The principal opinion concludes that the Commerce Commission may use the Missouri rate as a factor in fixing the Illinois rate. The order itself reflects that the Commission did more—that is, in fact, adopted the Missouri rate without modification and without application of the Illinois statute, or the Commission's expertise. As quoted in the opinion, the order notes that "[u]nder traditional rate-making procedures," the Commission would approve rates yielding acceptable return upon the value of petitioner's property used in Illinois to serve Illinois customers, but that the peculiar circumstances of the operations in both States: "render such

consideration impossible in this instance without imposing unjust and unreasonable discriminatory rates on Illinois rate payers."

The power to determine whether rates are discriminatory under the statute is limited to discrimination with reference to parties who are before the Commission. (*Lowden v. Illinois Commerce Com.* (1941), 376 Ill. 225, 33 N.E.2d 430.) We find no claim that there is discrimination among the customers served in Illinois.

The greatest error is that the Commission has chosen to fix the rates of a utility doing interstate business upon a consideration of evidence which is not properly admissible in cases concerning intrastate utilities. The Commission refuses to apply the same standard and criteria to Union Electric which admittedly would be properly applied in fixing the rates of other utilities in Illinois. Such procedure is arbitrary and capricious without pretense of expertise or equal protection of the law.

The judgment of the trial court should be affirmed.